306 F.2d 277
 113 U.S.App.D.C. 117
 SWIFT & COMPANY, Swift & Company Packers, Petitioners,
v.
FEDERAL MARITIME COMMISSION and United States of America,
Respondents, West India Fruit & Steamship Co.,
Inc., Gulf and South Atlantic Havana
Steamship Conference, et al.,
Intervenors.
GULF AND SOUTH ATLANTIC HAVANA STEAMSHIP CONFERENCE et al.,
Petitioners,
v.
FEDERAL MARITIME COMMISSION and United States of America,
Respondents, Swift& Company and Swift & Company Packers,
American Waterways Operators, Inc., National Industrial
Traffic League, Intervenors.
WEST INDIA FRUIT & STEAMSHIP CO., Inc., Petitioner,
v.
FEDERAL MARITIME COMMISSION and United States of America,
Respondents, Swift& Company and Swift & Company
Packers, American Waterways Operators,
Inc., National Industrial
Traffic League, Intervenors.
 Nos. 16288, 16444, 16455.
 United States Court of Appeals District of Columbia Circuit.
 Argued March 5, 1962.
Decided May 24, 1962.
 
 Mr. George F. Galland, Washington, D.C., with whom Mr. Robert N. Kharasch, Washington, D.C., was on the brief, for petitioners in No. 16,288 and intervenors Swift & Co., Swift & Co. Packers and National Industrial Traffic League in Nos. 16,444 and 16,455. Mrs. Amy Scupi, Washington, D.C., was also on the brief for petitioners in No. 16,288.
 Mr. Edward S. Bagley, New Orleans, La., of the bar of the Supreme Court of Louisiana, pro hac vice, by special leave of court, for petitioner in No. 16,444. Mr. Joseph M. Rault, New Orleans, La., also entered an appearance for petitioner in No. 16,444.
 Mr. J. Alton Boyer, Washington, D.C., with whom Mr. Odell Kominers, Washington, D.C., was on the brief, for petitioner in No. 16,455.
 Mr. Harold L. Witsaman, Atty., Federal Maritime Commission, of the bar of the Supreme Court of Ohio, pro hac vice, by special leave of court, with whom Messrs. James L. Pimper, Gen. Counsel, and Robert E. Mitchell, Deputy Gen. Counsel, Federal Maritime Commission, were on the brief, for respondent Commission. Mr. Richard A. Solomon, Atty., Dept. of Justice, at the time the brief for respondent United Staes was filed, was on its brief. Mr. Edward Aptaker, asst. Gen. Counsel for the Commission at the time the record was filed, entered an appearance for the Commission. Mr. Irwin A. Seibel, Atty., Dept. of Justice, entered an appearance for respondent United States.
 Mr. Gerald D. Morgan, Washington, D.C., with whom Mr. John H. Eisenhart, Jr., Washington, D.C., was on the brief, for intervenor American Waterways Operators, Inc.
 Mr. T.S.L. Perlman, Washington, D.C., entered an appearance for intervenor West India Fruit & Steamship Co., Inc., in No. 16,288.
 Mr. H. F. Gillis, Washington, D.C., also entered an appearance for intervenor National Industrial Traffic League.
 Before EDGERTON, FAHY and WASHINGTON, Circuit Judges.
 WASHINGTON, Circuit Judge.
 
 
 1
 This opinion deals with three related appeals arising out of a Report and Order issued by the Federal Maritime Board[1] on February 3, 1961, which found that the West India Fruit & Steamship Company ('West India') and other members of a steamship conference had violated various provisions of the Shipping Act, and directed hearings to allow a complaining shipper to prove damages for a specified period. The principal issue before the Board was whether the conference unlawfully attempted to control freight movements from St. Louis, a port not specifically named in the conference agreement.
 
 I.
 
 2
 Since 1935, the major steamship lines engaged in the ocean carriage of cargo from United States Gulf and South Atlantic ports to Cuba have been operating together under a rate-fixing agreement approved by the Federal Maritime Board pursuant to Section 15 of the Shipping Act of 1916, 46 U.S.C.A. 814. This organization of steamship lines, called the Gulf and South Atlantic Havana Steamship Conference ('Conference'), has, long employed 'dual rates,) whereby ocmpanies agreeing to ship only on members' vessels were charged lower rates than other shippers. Swift & Company, with its subsidiary Swift & Company Packers (herein collectively 'Swift'), was during 1958 and for some years previously a party to such a dual-rate contract, under which Swift promised to use Conference carriers for all goods 'shipped directly or indirectly from Gulf and South Atlantic ports of the United States' to Cuba, in return for a lower rate.
 
 
 3
 Swift had long shipped lard to Cuba via railroad tank car to Florida and from there in freight cars on West India's car ferry. In the spring of 1958 Swift, with another company, formed a barge company and commenced shipping bulk lard via barge from St. Louis, Missouri, to Cuba.[2] Swift thus eliminated both the inland rail freight and West India's ocean freight. The barge service was suspended in October 1958 by decree of the Cuban government. On July 10, 1958, however, the Conference informed Swift that it considered the barge shipments a violation of Swift's agreement to utilize Conference members' ships. Swift denied the breach, and arbitration on the question, pursuant to the 1958 Agreement, commenced in March 1959. The majority of the arbitrators, on June 10, 1959, found that Swift 'had violated the agreement with the Conference' and 'is to pay the Conference the sum due (as damages) under the terms of the agreement.'
 
 
 4
 Meanwhile, in October 1958, the Conference changed the language in its 1959 Freighting Agreement so that it would specifically apply to movements such as that undertaken by Swift from St. Louis. On December 31, 1958, Swift refused to sign the 1959 Agreement until the new language (paragraph (b)) which specifically covered shipments from St. Louis had been removed and the interpretation of Article 1 giving it such effect revoked. The Conference refused both conditions.
 
 
 5
 On January 12, 1959, the Federal Maritime Board issued an order stating (1) that the new paragraph (b) appeared to be a new agreement requiring approval by the Board under Section 15 of the Shipping Act, (2) that the new paragraph may violate Sections 14, 15, 16 and 17 of the Act, and (3) ordering the Conference to 'cease and desist from effectuating' the new provision. The order initiated an investigation set for hearing as Docket No. 849.[3]
 
 
 6
 Notwithstanding its argument that the 1958 Agreement covered St. Louis, the Conference also filed the 1959 Agreement for Board approval, presumably as a modification of the Conference Agreement. Docket No. 851 was then initiated to determine if Article 1 was a new agreement which must be approved pursuant to Section 15. In other words, Docket No. 851 was to consider the entire Article 1 of the 1959 Agreement, while Docket No. 849 was to consider only the interpretation in paragraph (b) thereof. On May 21, 1959, Swift filed with the Board a complaint against the Conference and its members. It asserted, inter alia, that the 1959 Agreement was unlawful, and requested reparations. This complaint, and a later amendment, were set for hearing as Docket No. 854. All three proceedings were consolidated.
 
 
 7
 The Conference on March 10, 1959, notified all of its contract shippers (not including Swift) that it would comply with the January 12 and February 19, 1959, cease and desist orders and 'give no effect' to the new clause in the 1959 Agreement. Swift was notified on April 27, 1959. On May 8, 1959, Swift signed the 1959 Agreement effective May 11, 1959. Between January 1, 1959, and May 10, 1959, Swift continued to ship to Cuba on West India's car ferries, and not having signed a dual-rate contract for that time, Swift paid the higher 'non-contract' rates.
 
 
 8
 On February 3, 1961, the Board found that West India and other Conference members had, in seeking to extend the dual-rate system to ports such as St. Louis, violated various provisions of the Shipping Act. The Report fixed the period of reparations, but directed additional 'proceedings to determine the exact amount of the reparations * * *.' In Nos. 16,444 and 16,455 the Conference and West India seek review of both the February 3 Report and Order and the denial of subsequent petitions for reconsideration and clarification. In No. 16,288, Swift asserts that the Board improperly denied a portion of its claim for reparation.
 
 II.
 
 9
 The basic issue in Nos. 16,444 and 16,455 is the legality of the actions of the Conference and its members with respect to the movement of Swift's freight from St. Louis. In substance, the Board found that the conference was attempting to assert control over cargo commencing a through-water movement from St. Louis in the same manner (and in a way as detrimental to commerce) as if St. Louis were a port within the scope of the agreement. To quote the Board:
 
 
 10
 'The Conference by letter dated July 10, 1958 told Swift it considered Swift's shipments by such barges a violation of its agreement to ship on Conference members' ships because St. Louis was a Gulf and South Atlantic port covered by the agreement * * *.
 
 
 11
 '* * * The 1958 Agreement contains no provision naming St. Louis * * * but the respondents argue it reasonably may be interpreted to extend to this port because of the word 'indirectly' as applied to cargo shipped from Gulf and South Atlantic ports. * * * Since the restriction is invalid, the Examiner correctly held the agreement did not apply to shipments from St. Louis, nor is it applicable to shipments through New Orleans.
 
 
 12
 '* * * The 1958 and 1959 Agreements do not name any port located on an inland waterway or not located on the Atlantic or Gulf coast. It is argued that, nevertheless, the 1958 Agreement, as interpreted, or as revised in 1959 implies that, without naming the port, it covers the carriage of cargo originating at or from any inland port, in this case St. Louis, exported by way of any river, flowing through any Gulf port such as New Orleans, i.e., the Mississippi River.
 
 
 13
 'The basis for the Examiner's conclusion was that the restriction by the respondent common carriers by water acting together prevented, (1) shippers from using the Mississippi River, on which large amounts of public money have been spent for navigation and harbor improvements, (2) river port cities from obtaining cargo for shipment therefrom and (3) traffic in lard by barge transportation from being used by shippers when it has certain economic advantages. The restrictions tended to compel shippers to forego these advantages in favor of using conference line ships from the ports they served.'[4]
 
 
 14
 The Conference and West India argue that the Board misstated the Conference interpretation of the 1958 Agreement, that the interpretation was not a modification of the basic agreement, and that petitioners did not in any event violate Section 15. We disagree. We think that the Board acted reasonably in finding that the Conference interpretation and its effectuation constituted a 'modification' and was the kind of agreement condemned by Section 15, unless approved by the Board.[5] Because the 1958 Agreement is not simply a private contract between private parties, the intent of the parties is only one relevant factor, and the Board not only can, but must, weigh such considerations as the effect of the interpretation on commerce and the public. Moreover, the agreement existed legally only because approved by the Board. The Board must be given reasonable leeway in delineating the scope of the agreement and therefore the extent of its prior approval.
 
 
 15
 The Conference and West India also contend that the Board erred in holding that they violated Section 15 by failing to file the modification of their 1958 Freighting Agreement. They argue that this finding is beyond the scope of the issues before the Board. But Swift's amended complaint, in paragraph 13, specifically alleges that 'any construction of language in prior or future agreements which gives them them the same effect (as the new language in the 1959 Agreement) * * * is unlawful under section 15 of the Shipping Act, 1916 (46 U.S.C. 814) because not approved and non-approvable * * *.' The Conference and West India claim, however, that the Board has misconstrued Section 15 by making a failure to file unlawful. We need not decide whether failure to file alone can constitute a violation, for in the context of this case the finding is premised not only on a lack of filing but also on partial effectuation of the modification.[6] Thus, the Conference applied the 1958 Agreement so as to find a 'violation' by Swift, and claimed damages in arbitration. Similarly, as to the 1959 Agreement, the Conference urged Swift to sign, and refused to enter into a contract without the new interpretation. We find that the action taken by the Conference and West India can reasonably be found to fall within Section 15, which provides that 'it shall be unlawful to carry out in whole or in part, directly or indirectly, any such agreement * * *.' 46 U.S.C.A. 814.
 
 
 16
 The Conference and West India further claim that the Board erred in not applying Public Law 85-626, 72 Stat. 574, 46 U.S.C.A. 812, which serves (within certain limits which we need not now examine) to validate dual-rate arrangements 'in use by the members of a conference on May 19, 1958, which conference is organized under an agreement approved under section 15' by the Board.[7] Thus, Public Law 85-626 appears to validate dual-rate arrangements under the 1958 Agreement unless and until they are expressly disapproved, cancelled or modified by the Board. However, the question here is not whether the 1958 Freighting Agreement is 'unlawful' or 'invalid,' but whether the 1958 Agreement extends so far as to cover the barge shipments from St. Louis undertaken by Swift. This is a question of interpretation, and we do not think that Public Law 85-626 automatically validates any interpretation given to an agreement, as contrasted with dual-rate arrangements made under the agreement. The 1959 Agreement is clearly outside the protection of the cited statute.
 
 
 17
 We have considered the remaining arguments of the Conference and West India as to the Section 15 violation, as well as their arguments dealing with the violation of Section 16 and 17, but have not found them persuasive. We similarly find no merit in their contention that the Board erred in disapproving the disputed provision of the 1959 Agreement for the future.
 
 
 18
 We turn next to the treatment by the Board of the arbitrator's decision. No private arbitration could negate the Board's statutory power to determine the validity of the dual-rate agreement. The more serious issue is whether the Board is precluded by the arbitration from awarding Swift reparations. We think not, for the arbitration opinion decided only the meaning of the Freighting Agreement, as garnered from the intent of the parties and the surrounding circumstances.[8] That may have been appropriate for the arbitration, but, as we have pointed out, the Board's function is to interpret and rule on the legality of the agreement's language and effect in the light of the public interest. We have examined the arbitration opinion and award carefully, but find no mention whatever of the legality of the agreement, as opposed to its interpretation. In these circumstances, at least, the Board was certainly free to rule on the legality issue and to award reparations. Especially is this true where, as here, the order is not simply a private matter between two private litigants, but also has its public aspects.
 
 III.
 
 19
 We now turn to the question of reparations, presented primarily in No. 16,288.[9] The Board says that Swift can prove reparations for the period from January 1, 1959, when the 1958 Agreement had expired, until January 21, 1959, when the Board's cease and desist order was published in the Federal Register, thus giving Swift constructive notice of the issuance of the order, i.e., that the lawfulness of the agreement it would sign would be duly determined by the Board. But we do not believe that the January 21 date is the critical one. Swift is entitled to show damages for the period during which Swift could have obtained the contract rates only by signing an unlawful agreement which the Conference threatened to effectuate. But Swift argues, and we agree, that the fact that the cease and desist order was issued gave Swift no assurance that the Conference would obey the order without protest or challenge.[10] Swift was therefore no more obliged to sign the illegal contract (in order to obtain the favored rates) on January 21, 1959, than it was previously. This does not necessarily mean, as Swift contends, that Swift can recover for the entire period from January 1 to May 11, 1959, the date when lthe contract signed by Swift became effective. Moreover, Swift may have known that the agreement would not be enforced prior to publication of the order. Thus, there may well have been a time, either before or after January 21, when Swift became aware, or should have been aware, that the Conference would not attempt to enforce its position. It is at that point that Swift should have signed the contract, and it is entitled to no reparations beyond that time.
 
 
 20
 For these reasons, the order of the Board on review herein insofar as it applies to the claims of complainants for reparations will be set aside, and in all other respects will be affirmed. The matter will be remanded to the Federal Maritime Commission for further proceedings not inconsistent with this opinion.
 
 
 21
 So ordered.
 
 
 
 [1]
 The Federal Maritime Board has recently been succeeded by the Federal Maritime Commission. See Reorganization Plan No. 7 of 1961, 26 Fed.Reg. 7315. References in this opinion will be to the Board, but this should be considered as including the Commission, where appropriate
 
 
 [2]
 While on the first voyage an ocean-going tug towed the barge all the way from St. Louis to Havana, on the four subsequent voyages a river tug was used on the Mississippi River haul, and exchanged at New Orleans for an ocean-going tug to Cuba
 
 
 [3]
 On February 19, 1959, the Board issued a second order of investigation which superseded that of January 12. It was identical to the first order except that it ordered an investigation to determine whether the new provision 'constitutes a new Section 15 agreement and/or (2) would be unjustly discriminatory * * *.' (The emphasized words constitute the only change.)
 
 
 [4]
 Cf. the Contract Routing Restrictions case, 2 U.S.M.C. 220 (1939)
 
 
 [5]
 Compare Trans-Pacific Freight Conference of Japan v. Federal Maritime Board, 112 U.S.App.D.C. 290, 302 F.2d 875 (1962), where we remarked that the assessment and collection of fines did not in itself appear to be a 'modification.' Trans-Pacific primarily involved a dispute over the underlying facts, as opposed to a question of interpretation of the agreement itself
 
 
 [6]
 Compare Federal Maritime Commission, Unapproved Section 15 Agreements, Docket No. 882, April 9, 1962, 30 U.S.L. Week 2519 (April 24, 1962) (failure to file uneffectuated rate agreement violates 1916 Shipping Act)
 
 
 [7]
 See also Public Law 86-542, 74 Stat. 253; Public Law 87-75, 75 Stat. 195, 46 U.S.C.A. 812 note
 
 
 [8]
 'The case relates primarily to the meaning of Section 1 of the Freighting Agreement between the parties * * *.' Arbitration Opinion and Award
 Had the arbitration decided that the agreement, as interpreted by the Conference, was legal and valid, there would nevertheless be some doubt as to whether such a decision by the arbitrators would preclude the grant of reparations to Swift by the Board. Cf. Loving & Evans v. Blick, 33 Cal.2d 603, 204 P.2d 23, 27 (1949); Smith v. Gladney, 128 Tex. 354, 98 S.W.2d 351, 352 (1936); In re Gale, 176 Misc. 277, 27 N.Y.S.2d 18 (1941); Western Union Tel. Co. v. American Communications Ass'n, 299 N.Y. 177, 86 N.E.2d 162 (1949).
 
 
 [9]
 The Board's order of February 3, 1961, appears to be reviewable, even though it does not determine the amount of reparations, but leaves that for future proceedings. See our decision in Flota Mercante Grancolombiana, S.A. v. Federal Maritime Commission, 112 U.S.App.D.C. 302, 302 F.2d 887 (1962). Cf. Grace Line, Inc. v. Federal Maritime Board, 2 Cir., 280 F.2d 790 (1960), cert. denied, 364 U.S. 933, 81 S.Ct. 380, 5 L.Ed.2d 365 (1961). We believe the order to be 'final' for purposes of the Hobbs Act, 5 U.S.C.A. 1031 et seq. Cf. Isbrandtsen Co. v. United States, 93 U.S.App.D.C. 293, 297, 211 F.2d 51, 55, cert. denied sub nom. Japan-Atlantic & Gulf Conference v. United States, 347 U.S. 990, 74 S.Ct. 852, 98 L.Ed. 1124 (1954); D. L. Piazza Co. v. West Coast Line, 210 F.2d 947 (2d Cir.), cert. denied, 348 U.S. 839, 75 S.Ct. 42, 99 L.Ed. 661 (1954). Counsel before us have not challenged our right to review this segment of the case
 
 
 [10]
 Moreover, there is some doubt as to the validity of the order, since the Board has not been given express statutory authorization to issue cease and desist orders. See our decision in Trans-Pacific Freight Conference of Japan v. Federal Maritime Board, supra, note 5. But Swift asked the Board to issue the order, and is not in a very tenable position in questioning it here