C. TENNANT & SONS, INC., et al.,
Plaintiffs,

v.

NEW YORK TERMINAL CONFERENCE
et al., Defendants.

UNITED STATES of America and Federal Maritime Commission, Plaintiffs-Intervenors,

v.

NEW YORK TERMINAL CONFERENCE
et al., Defendants.

No. 68–Civ. 4740.

United States District Court
S. D. New York.

Jan. 30, 1969.

Supplemental Memorandum
March 4, 1969.

Zelby & Burstein, New York City, for plaintiffs, Herbert Burstein, New York City, of counsel.

Burlingham, Underwood, Wright, White & Lord, New York City, for defendants, Elkan Turk, Jr., and Joseph A. Byrne, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty., Louis E. Greco, Atty. in Charge, Admiralty and Shipping Section, Dept. of Justice, New York City, for plaintiffs-intervenors, Peter Martin Klein, Robert N. Katz, Sol., Federal Maritime Commission, H. B. Mutter, Asst. Sol., of counsel.

## MEMORANDUM

CROAKE, District Judge.

A motion for a preliminary injunction was brought in this action to enjoin a rate increase for certain services provided by the defendants pending a determination of the legality of the rates by the Federal Maritime Commission. After hearing arguments, studying the testimony and exhibits, and reviewing affidavits, this court concludes that the motion must be denied.

The action was brought by twenty-three importers and exporters of goods through the Port of New York and four trucking firms which transport those goods to and from the piers. The Federal Maritime Commission has intervened in support of the plaintiffs. The defendants are the New York Terminal Conference, an association of terminal operators and steamship companies, and its sixteen members.[1]

It appears from the evidence that moving cargo from the hold of a ship to a truck for land delivery can be described for purposes of this motion as a two-step operation. The usual practice is for the steamship company to arrange with the terminal operator or a stevedoring company to unload the cargo to a point on the pier, usually designated by the terminal operator or stevedore and known as the "point of rest." The work is done by longshoremen employed by the contracting stevedore or terminal operator and is billed to the steamship company. A different gang of longshoremen is engaged by the stevedore or terminal operator to load the cargo into the truck. The trucker is charged by the stevedore or terminal operator for this service and passes it on to his customer.

---

1. One plaintiff is primarily in the export business, and other plaintiffs are involved in some exporting. In the whole, however, the evidence dealt with importing, so the examples and discussion in this memorandum will be in terms of inbound cargo. This motion and the underlying action are but an episode in the long history of legal maneuvers by elements of the New York Waterfront to maintain a status quo. An almost identical motion was heard in this district in 1956. See United States Trucking Corp. v. American Export Lines, D.C., 146 F.Supp. 924, re-argument granted, D.C., 148 F.Supp. 61.

The New York Terminal Conference was formed to set a uniform rate for the second part of this operation.[2] It has issued a detailed set of tariffs setting rates for various commodities for " * * * the service of moving cargo from a place of rest on the terminal facility, elevating the cargo onto the truck and stowing of the cargo in the truck, but [the service] shall not include, among other things, special stowage, sorting or grading of, or otherwise selecting the cargo for the convenience of the trucker or the consignee, nor the loading of cargo onto consignee's pallets." [3] On October 30, 1968, the Conference issued Supplement No. 6 to Tariff No. 7 which announced a 23% surcharge, effective December 1, 1968.[4] It is this surcharge that the plaintiffs seek to enjoin.

The Federal Maritime Commission is now considering the legality of the Truck Loading and Unloading Tariff. In October of 1965 an association of truck operators complained to the Commission that the five and twelve percent surcharges put into effect in November of 1964 and October of 1965 were illegal.[5] Shortly thereafter the Commission began its own investigation of the rates [6] and consolidated the proceedings. The investigation has been expanded to include the surcharge announced in Supp. No. 6.[7]

The plaintiffs contend that the surcharge is illegal in that it is detrimental to the commerce of the United States and unreasonable,[8] and that they will be injured by it. Because the Commission will eventually determine the legality of the rates, including the surcharge, plaintiffs have asked for relief pending a decision by the Commission. They have, moreover, asked that the preliminary injunction expire when the Commission hands down its decision or within 180 days after an order of this court is issued, whichever is sooner.

The earlier memorandum we filed indicated the standard by which this motion would be decided:

" * * *· A preliminary injunction can be granted only if the Court, after weighing all the factors, finds that the status quo should be maintained pending disposition on the merits. Among the more important factors to be considered are the relative importance of the rights asserted and the acts to be enjoined, the harm that would result during the pendency of the action from granting or refusing to grant a preliminary injunction, the chances of success the movant has on the merits, and the public interest. Unicon Mgt. Corp. v. Koppers Co., 366 F.2d 199, 204–05 (2d Cir. 1966); West India Fruit & Steamship Co. v. Seatrain Lines, Inc., 170 F.2d 775, 779 (2d Cir. 1948); FMC v. Atlantic & Gulf/Panama Canal Zone, 241 F.Supp. 766, 778 (S.D.N.Y. 1965), quoting Communist

2. The Conference operates under FMC Agreement No. 8005, approved March 23, 1955. Because this agreement was approved by the Federal Maritime Commission, Conference members are exempt from antitrust regulation in fixing truck loading and unloading rates. 46 U.S.C. § 814.

3. New York Terminal Conference, Truck Loading and Unloading Tariff No. 7, p. 5. The definition of truck unloading is analogous.

4. The defendants agreed not to enforce the surcharge noticed in Supplement No. 6 pending a determination of this motion, which was argued December 3, 1968. The

strike by members of the International Longshoremen's Association which began on December 20, 1968 and which continues today has made a speedy determination of this motion unnecessary.

5. Empire State Highway Transp. Ass'n v. American Export Lines, Inc., et al., No. 65–39 (FMC, filed Oct. 5, 1965).

6. Truck Loading and Unloading Rates at N. Y. Harbor, No. 65–46 (FMC, filed Dec. 14, 1965).

7. Id., Second Supplemental Order issued November 22, 1968.

8. See 46 U.S.C. §§ 814 and 816.

Party [of United States of America] v. McGrath, 96 F.Supp. 47, 48 (D.D.C. 1951) * * * " [9]

The weight to be given to each of these factors on a motion for a preliminary injunction is not rigidly fixed; the various factors must be weighed, one against the other, to determine where the equities balance. It is not necessary, for example, that the moving party be reasonably certain to succeed on the merits. If the harm that may occur to the plaintiff is sufficiently serious, it is only necessary that there be a fair chance of success on the merits.[10]

## I.

■ A permanent injunction may be granted if the plaintiff shows by a preponderance of the evidence that a threatened violation of some legal right will result in irreparable injury to him.[11] The chance of success on the merits of these plaintiffs thus depends on the legality of the surcharge.

Without going into the arguments for or against the legality of the surcharge, it can be said that the plaintiffs have a fair chance of establishing its illegality. The fact that the Federal Maritime Commission ordered an investigation of the rates, the ruling of the hearing examiner that data not included in the Price Waterhouse study was necessary and relevant,[12] and the opinions offered by Commission officials indicate that there is a reasonable possibility that the surcharge is unreasonable.

■■ As the matter was presented to this court, the legality of the surcharge depends in part on the nature of certain arrangements by which steamship companies reimburse terminal operators for losses on truck loading and unloading operations, and the propriety of including these payments in the computation of a reasonable tariff.[13] Since resolution of this issue would require the receipt of a considerable volume of testimony,[14] the making of significant policy determination on the economic structure of the Port of New York,[15] and a detailed analysis of matters which the Federal Maritime Commission was created to study and regulate, and since resolution of the issue is not necessary to this decision, we leave it to the Commission. We find only that there is a reasonable possibility that the surcharge may be found illegal.

9. Memorandum filed Dec. 18, 1968.

10. See SEC v. Frank, 388 F.2d 486, 491 (2d Cir. 1968), citing Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2d Cir. 1953).

11. E. g., Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506, 79 S.Ct. 948, 3 L.Ed.2d 988 (1958); Swift & Co. v. United States, 276 U.S. 311, 326, 48 S.Ct. 311, 72 L.Ed. 587 (1928).

12. Ruling on motion to restrict evidence, Empire State Highways Transp. Ass'n, *supra* n. 5 and 6, filed December 3, 1968.

13. The not-unqualified opinion of an accounting firm, although one held in high regard, is not dispositive of a legal question with important policy ramifications entrusted by the Congress to an administrative agency.

14. The court heard interesting testimony on the history of the reimbursement practice, but the details of the practice are, not surprisingly, unclear. See FMC v. New York Terminal Conference, 373 F.2d 424 (2d Cir. 1967), *affirming*, 262 F. Supp. 225 (S.D.N.Y.1966). The Court was not provided with sufficient data to justify the surcharge on the basis of cost increases. While it is clear that Conference members have suffered increased labor costs recently and will be paying significantly higher wages under the new ILA contract, the magnitude of these increases attributable to truck loading and unloading, the amount of savings that will result from the containerization provision of the new contract, and similar matters were not put in evidence. Although some surcharge may have been justified on a cost basis, the Court cannot say that one of exactly 23% or one near 23% is reasonable.

15. It would be unwise for this court to decide on a motion for a preliminary injunction whether, for example, a) the "user concept" is applicable here, and b) whether that principle requires those who use and/or those who benefit from a service to pay for it.

The second element of the plaintiffs' case on the merits, of the harm imposition of the surcharge will cause, is discussed below.

## II.

No substantial evidence was adduced that any segment of the public would be injured by the rate increase. The public is, however, presumably interested in the matter since an administrative agency has ordered an investigation and has intervened in this action.

■ The Commission contends that the status quo should be maintained pending its decision; otherwise "there is a reasonable likelihood that the Commission would be frustrated and rendered powerless to protect the private and public interests from being adversely affected by the New York Terminal Conference's proposed new rates." [16] We are inclined to assist the Commission in fulfilling its responsibility,[17] but we have no evidence before us to show that there would be any substantial injury to the public if rates were temporarily raised or that the Commission's investigation would be disrupted. We will not issue an injunction, even a preliminary one, based on speculation. There is no clear authority, moreover, for issuing an injunction to aid an administrative agency absent statutory authority without a finding that there would be substantial injury to some individuals.[18]

## III.

To prove that they would be injured by the surcharge, the plaintiffs and the Commission presented eleven witnesses at the hearing; affidavits of two persons who did not testify had been filed with the motion. On the whole, we are not able to say that the plaintiffs will suffer irreparable harm.

Officers and employees of import firms and associations [19] who testified all offered substantially the same testimony. Each testified that the previous 5 and 12% surcharges which became effective in 1966 resulted in their diverting cargo formerly shipped through New York to other ports. Factors other than the surcharges played a part in some of their decisions. One firm shifted local transportation of imported copper from trucks to lighters. Although percentage figures, and occasionally absolute figures, were given of the amount of cargo diverted, the court is unable to determine the substantiality of these diversions without an overall picture of local transportation of waterborne cargo.

The use of ports other than New York does not necessarily mean that the importers will suffer substantial losses. In only two cases witnesses for import firms testified that their firms would suffer financial losses because of the surcharge. One witness testified that the importation of honey would cease; another testified that spice grinders

16. H. B. Mutter, Asst. Solicitor of the FMC, Affidavit in support of plaintiffs' application for an injunction.

17. This inclination is diminished by the fact that the investigation by the Commission has been underway, for whatever reason, for over three years. See FMC v. New York Terminal Conference, *supra* n. 14.

18. Although there is merit to the position that agencies should be aided in their functions by the courts, the courts have applied equitable principles and required that some injury be proven. See West India Fruit & Steamship Co. v. Seatrain Lines, 170 F.2d 775, 779 (2d Cir. 1948), FMC v. Atlantic and Gulf/Panama Canal Zone, 241 F.Supp. 766, 777 (S.D.N.Y. 1965) ; Isbrandtsen Co. v. United States, 81 F.Supp. 544 (S.D.N.Y.1948). The fact that the Congress has not granted the Commission special authority to seek injunctions indicates that equitable principles must be used. See FMC v. Atlantic & Gulf/Panama Canal Zone, at 777, *supra.*

19. The firms imported copper, aluminum, coffee, frozen foodstuffs, spices, rubber, cotton rags, and other items.

would import spices themselves rather than looking to his firm for their needs. In neither case did the witness show that his firm would be seriously injured by a loss of this business for 180 days. We accordingly have no evidence upon which to find that any importers would be injured by a temporary imposition of the surcharge.

The witnesses from the trucking firms, some of which service import firms that are plaintiffs, also offered substantially the same testimony. Since the previous surcharges resulted in diversion of cargo to other ports, New York truckers carried less cargo. They lost some business that stayed in the port to lighters, and the amount of business done for the railroads "in lieu of lighterage" diminished. Each witness predicted the business of carrying cargo from the piers would further decrease if the surcharge becomes effective; trucking in lieu of lighterage would nearly disappear. These predictions were for the most part based on the self-serving statements of customers of the truckers that they would divert cargo to other ports or to lighters if the surcharge became effective. The persons making these statements and the circumstances under which they were made were rarely identified. Except for the reported statements of the railroads, the statements of the customers were generally indefinite or speculative. We are accordingly unconvinced by the truckers' predictions.

Truck loading and unloading charges are not the only factor used by traffic managers to decide which port to use. The services provided in each port and the proximity of the market must also be considered. On the whole, the witnes-

ses for the plaintiffs did not discuss these factors in predicting diversions. Some witnesses who predicted diversions to Baltimore and Philadelphia were even unaware that the surcharges to truck loading and unloading rates in those ports had recently been announced. Considering all plaintiffs' evidence on the probability of diversion, while we are certain that some diversions will result, we cannot say that the amount of diversion will be substantial. The fact that Conference members would also suffer from substantial diversions to other ports, leads to the conclusion that they would not be as great as some of the witnesses predicted.

Since we cannot find that substantial diversions will occur, either on the basis of the truckers' predictions or considering all the evidence, we cannot find that the truckers will be seriously injured. Even if we could conclude that diversions would be substantial, we would have trouble concluding that the trucking firms would be seriously injured, since little financial data was presented.[20] We are accordingly unconvinced that the consequences to local truckers will be as dire as is necessary for the imposition of an injunction.

Even if we were to find that the plaintiffs would suffer serious injury by an imposition of the surcharge for 180 days, we would be unable to find that that injury would be irreparable. Section 22 of the Shipping Act provides that "Any person may file with the Federal Maritime Board a sworn complaint setting forth any violation of this chapter by a common carrier by water, or other person subject to this chapter, and asking reparation for the injury, if any,

---

20. Of the four truckers which were plaintiffs, no data was presented on one. Seventy percent of the business of another was in import-export, but that includes the operation of three warehouses. Substantially all the business of one involved the warehousing and trucking of automobiles for export; much of its business is contracted for in advance, but no estimate of losses was made. On the data available, it can only be guessed that

one company, ninety percent of whose business is pier trucking, would lose substantial income over the 180 days that the injunction would run; even for this company, any finding of the size of the loss would be speculative. The plaintiffs understandably might want much of the data necessary for a decision on an injunction to remain confidential, but, if so, then they may have to go without protection of the injunction.

caused thereby. * * * " [21] The burden that would be imposed on the plaintiffs in seeking reparations is a factor that may be considered by this court,[22] but it need not be given much weight.[23] If the plaintiffs had shown that they would suffer a long-term loss from a temporary imposition of the surcharge, then the difficulty of proof may have influenced this court.[24] Since the losses would occur in a 180 day period, it does not appear that the plaintiffs would be seriously burdened. Plaintiffs' injuries, if any, are therefore reparable.[25]

■ We find that the plaintiffs would not suffer irreparable injuries if the preliminary injunction is denied.

### IV.

It is clear that if the surcharge does not go into effect that the defendants' receipts for the next 180 days will be less than they otherwise would be. The magnitude of their loss is not, however, in evidence. We cannot say definitely whether the loss of the 23% surcharge for that period would seriously injure Conference members or not.

It appears, however, that the defendants would not be seriously injured. Truck loading and unloading accounts for a small portion of the revenue of both the steamship companies, terminal operator, and stevedoring companies named as defendants. Of the two terminal operator witnesses that testified, one's company was reimbursed for losses on truck loading and unloading operations by steamship companies. Terminal operators with similar arrangements

therefore stand to lose nothing by staying the increase.

If Conference members were going to suffer seriously by abiding by the Tariff, then, as the president of one Conference member admitted, the firm could withdraw and charge any rate it thought necessary.[26]

■ We accordingly find that the defendants would not be injured if the preliminary injunction were granted.

For the reasons discussed, we find on the evidence the parties put before us that:

1. There is a reasonable possibility the 23% surcharge will be found to be unreasonable and unjust and/or discriminatory against commerce of the United States.

2. Permitting the surcharge to become effective will not interfere with the investigation of the Federal Maritime Commission nor will it be injurious to any element of the public.

3. Although an imposition of the 23% surcharge for a maximum of 180 days will result in the diversion of some cargo from the port of New York, and of some cargo from trucks to lighters,

   a. no serious injury will occur to the import-export plaintiffs as a group;

   b. the evidence is insufficient to determine that the trucking plaintiffs will be seriously injured;

   c. any injuries suffered are reparable.

4. Enjoining the surcharge for 180 days would not result in serious injury to the members of the New York Terminal Conference.

---

21. 46 U.S.C. § 821.

22. See West India Fruit & Steamship Co., *supra* n. 18; Pennsylvania Motor Truck Ass'n v. Port of Phila. Marine Terminal Ass'n, 183 F.Supp. 910, 918 (E.D.Pa. 1960).

23. FMC v. Atlantic & Gulf/Panama Canal Zone, *supra* n. 18, 241 F.Supp., at 780–781.

24. No effort was made to prove the contention made in some affidavits that busi-

ness lost during the 180 days could not be regained if the surcharge were found to be illegal.

25. No authority was found for the Commission's position that it could not receive complaints from customers of the truckers. See Rivoli Trucking Corp. v. New York Shipping Ass'n, 167 F.Supp. 940, 942 (S.D.N.Y.1957).

26. FMC Agreement No. 8005, ¶ 5.

Since the plaintiffs will suffer no irreparable injury if the surcharge goes into effect, we conclude that the motion for the preliminary injunction must be denied.

The standards for determining the merits of this action will be little different than those used to decide this motion. The burden of proof for the plaintiffs will be greater and much of the hearsay evidence heard without any foundation being laid will not be received. This decision is nevertheless limited to the motion for a preliminary injunction.

So ordered.

## SUPPLEMENTAL MEMORANDUM

On January 30, 1969 this court denied plaintiffs a preliminary injunction. This decision was reached after the parties were given a full opportunity to present evidence and to argue and after lengthy consideration by this court. Plaintiffs now move to reargue the motion. Counsel were heard on February 20 and allowed to submit affidavits after the hearing; the last affidavits received were submitted by the plaintiffs on February 27. In spite of the persuasive presentation made by counsel for the plaintiffs, their motion must be denied.

The motion for a preliminary injunction sought to restrain the defendants from putting into effect a 23 percent surcharge on truck loading and unloading rates for the New York piers. The injunction sought was to last for 180 days or until the Federal Maritime Commission decided the legality of the rates being charged, whichever period was shorter. The court phrased its findings in terms of the maximum period for which the preliminary injunction was sought, 180 days. Plaintiffs now contend that the Commission cannot possibly reach a decision in 180 days from the date our decision was filed. Therefore, they say, the quantum of damages that they will suffer because of the imposition of the surcharge will be greater than the quantum used by the court in balancing the equities to reach its decision.

Plaintiffs' argument is off-target. This court did not find that the injury that would befall the plaintiffs over the 180 day period was not enough to justify imposition of the injunction. It found on the evidence presented that no serious injury would occur to the import-export plaintiffs and the degree of injury to the trucking plaintiffs was, at best, speculative. Merely arguing that a longer period is involved does not plug the evidentiary gaps.

Even if these gaps were filled—and plaintiffs' silence on the subject indicates that they cannot be—this court would have great difficulty in justifying an injunction that could have repercussions on shipping in other Atlantic Coast ports on the basis of injury to four out of hundreds of trucking firms in New York City. To hold the truck loading and unloading rate down in New York would, according to plaintiffs' argument on the main motion, have a detrimental effect on truckers in other ports where the rate has recently been increased. In spite of the sympathy that the unproven plight of the truckers evokes, this court could not intervene in the complex Atlantic Coast shipping industry on their behalf and unwittingly cause injury in other ports.

Before the evidentiary hearing was held on the motion for a preliminary injunction, this court suggested the possibility of an arrangement whereby the surcharge would be collected but placed in an escrow account. Such an arrangement would have obviated the necessity of the lengthy proceedings which have taken place. Plaintiffs now ask that the court impose such an arrangement. Although this court is unconvinced that some escrow arrangement is not feasible, it cannot impose an arrangement in light of its findings.

For the reasons stated, plaintiffs' motion to reargue is granted and the original decision is adhered to. Their motion for a preliminary injunction is denied.

So ordered.