**FEDERAL MARITIME COMMISSION, Plaintiff,**

v.

**AUSTRALIA/U. S. ATLANTIC AND GULF CONFERENCE, A/S ATLANTTRAFIK, et al., Defendants.**

**No. 72 Civ. 207.**

United States District Court, S. D. New York.

Feb. 4, 1972.

Whitney North Seymour, Jr., U. S. Atty; Gilbert S. Fleischer, Atty. in Charge, Admiralty and Shipping Section, U. S. Dept. of Justice, New York City; James L. Pimper, Gen. Counsel, Edward G. Gruis, Deputy Gen. Counsel, Gordon M. Shaw, Atty., Federal Maritime Comm., Washington, D. C., for Federal Maritime Comm.

Kirlin, Campbell & Keating, New York City, for defendants; Elmer C. Maddy, Baldvin Einarson, New York City, of counsel.

EDWARD WEINFELD, District Judge.

The Federal Maritime Commission ("Commission") seeks a preliminary injunction to enjoin the Australia/U.S. Atlantic and Gulf Conference ("Conference") and its members, ocean carriers engaged in the transportation of goods from ports in Australia to ports on the Atlantic and Gulf Coasts, from putting into effect an increased tariff rate filed

by the Conference with the Commission on the ground that it is a nullity.

The Conference and its members entered into a "dual rate" Agreement ("Agreement") approved by the Commission pursuant to the provisions of section 14b of the Shipping Act, 1916.[1] The scheduled rates and charges stipulated under the Agreement were filed with the Commission as required by the Act[2] and were in effect on December 22, 1971. The rates set forth therein may not be increased before a reasonable period, but in no case in less than ninety days.[3] On December 22, 1971, the Conference and its members, the defendants, filed a "currency devaluation adjustment surcharge" in its tariff of 8.57%, later reduced to 6.32% to become effective fifteen days thereafter, on January 8, 1972.

In filing the proposed increase on less than the ninety days required under section 14b(2) of the Act,[4] the Conference relied upon the "currency devaluation" provision of Article 23 of the Agreement, which in pertinent part provides:

"23. (a) In the event of war, hostilities, warlike operations, embargoes, blockades, currency devaluation by governmental action, regulations of any governmental authority pertaining thereto, or any other official interferences with commercial intercourse arising from the above conditions, which prejudicially affect the operations of any of the Carriers in the trade covered by this Agreement so as to render it reasonably impracticable or partially impracticable to continue such operations, the Carriers may consequentially suspend the effectiveness of this Agreement with respect to the operations affected, and shall notify the Shipper of such suspension. Upon cessation of any cause or causes of suspension set forth in this Article and invoked by Carriers, said Carriers shall forthwith reassume its or their rights and obligations hereunder and notify the Shipper on fifteen (15) days' written notice that its suspension is terminated.

"(b) In the event of any of the conditions enumerated in Article 23(a), the Carriers may increase any rate or rates affected thereby in order to meet such conditions in lieu of suspension. Such increase or increases shall be on not less than 15 days written notice to the Shipper. If the parties are unable to agree such increases or compromised increases before the effective date thereof this Agreement shall terminate on such effective date unless the Carriers shall give notice that such increase or increases have been rescinded and cancelled."

The Commission advised the Conference by telegram on December 23, 1971 that its proposed surcharge was not justified by the currency devaluation provision of Article 23(b) of the Agreement, and that the increase could be imposed only with ninety days' notice. The Conference differed from the Commission's view and an exchange of telegrams followed, during the course of which the Conference deferred the effective date of the surcharge to January 15, 1972. The Commission and Conference adhered to their respective positions and on January 13, 1972 the Commission notified the Conference by letter that it had rejected the proposed surcharge, since it was "contrary to the approved Shippers Rate Agreement and Section 14(b), Shipping Act, 1916. Inasmuch as these tariff filings did not bear an effective date of at least 30 days after the date of filing,[5] they are also contrary to the

1. 46 U.S.C. § 813a.

2. Shipping Act, 1916 § 18(b) (1), 46 U.S.C. § 817(b) (1).

3. Shipping Act, 1916 § 14b(2), 46 U.S.C. § 813a(2).

4. 46 U.S.C. § 813a(2).

[5.] Apart from the "dual rate" system embodied in the Shippers' Rate Agreement, the general rule provides that shippers' rates may go into effect on no less than 30 days' notice, unless the Commission,

provisions of Section 18(b), Shipping Act, 1916. Rejected tariff matter is void and its use unlawful, and the rates quoted in the rejected filings may not be implemented until lawfully refiled and in effect."

The Conference persisted in its position that its tariff was properly filed under section 18(b) of the Shipping Act, 1916,[6] that the surcharge could not be rejected on other grounds without a hearing, and that it planned to put it into effect on the scheduled date, January 15, 1972, and would then begin assessing and collecting the increased charges.

The Commission thereupon commenced this action, and upon notice to the Conference applied for a temporary restraining order enjoining the Conference from putting into effect the increased rate until the further order of the Court. The Commission alleged that the proposed increase was void and that the Conference's proposed assessment or collection thereunder would cause (a) irreparable injury by disruption of commercial dealings between shippers/consignees and their customers, and (b) substantial and unrecoverable financial losses by importers and manufacturers in the United States. After hearing counsel, this Court granted the requested temporary restraining order upon a finding that, if the increases were permitted to become effective, "irreparable injury will be visited upon the American Wool Industry, which prior to the proposed increase had made firm commitments based on existing prices

[rates] which cannot be passed on to other consumers and which would have a devastating economic effect upon the wool industry."[7]

Thereafter, upon allegations that the assessment and collection of the proposed surcharge in the absence of an applicable tariff on file with the Commission violated sections 18(b)(1), 18(b)(3), 18(b)(4) and section 14b of the Shipping Act, 1916, the Commission issued an order to the Conference and its members to show cause why they should not be ordered to cease and desist from assessing and collecting the proposed surcharge. A schedule was set up for the submission of affidavits and memoranda of law, with the last submission on February 11, 1972, and oral argument to be scheduled if requested or deemed necessary by the Commission.

The matter is now before the Court on the Commission's application for a preliminary injunction.[8] The hard core of this controversy centers about Article 23 of the Shippers' Rate Agreement, under which, in the event of "currency devaluation by governmental action", the carriers may increase their rates on fifteen days' notice and which they rely upon for justification of their action. If the provision was not properly invoked, it is beyond challenge that a ninety-day notice was required under section 14b(2) of the Shipping Act, 1916,[9] to put into effect new tariff rates. The Commission contends there was no "currency devaluation by governmental action" so as to trigger Article 23, and that to impose the surcharge on fifteen

---

for good cause shown, allows the tariff to go into effect upon shorter notice. Shipping Act, 1916 § 18(b)(2), 46 U.S.C. § 817(b)(2).

6. 46 U.S.C. § 817(b).

7. After hearing counsel for both sides, this temporary restraining order was subsequently extended for an additional ten days, "no change in the circumstances having been shown and for other good cause shown."

8. Defendants do not contest the jurisdiction of this Court to decide this motion in aid

of the Commission's power, and indeed such jurisdiction is incontestable. *See* West India Fruit & S.S. Co. v. Seatrain Lines, Inc., 170 F.2d 775, 778–779 (2d Cir. 1948), cert. dismissed, 336 U.S. 908, 69 S.Ct. 514, 93 L.Ed. 1072 (1949); Delaware River Port Auth. v. United States Lines, Inc.. 331 F.Supp. 441, 447 (E.D.Pa.1971); FMC v. Atlantic & Gulf/Panama Canal Zone, 241 F.Supp. 766, 774–777 (S.D.N.Y.1965).

9. 46 U.S.C. § 813a(2).

rather than ninety days' notice would be a per se violation of the Shipping Act; accordingly, the Commission claims it was justified in rejecting the proposed increase under section 18(b) (4) of the Shipping Act, 1916,[10] which provides:

" . . . the Commission is authorized to reject any tariff filed with it which is not in conformity with this section and with such regulations. Upon rejection by the Commission, a tariff shall be void and its use unlawful."

It is familiar teaching that a preliminary injunction should only issue upon a clear showing by the movant (1) of probable success on the merits, and (2) of likely irreparable injury unless the injunction is granted.[11]

■ On the issue of likelihood of success, the Commission's position that Article 23 was improperly invoked rests upon its contention that in fact there has been no "currency devaluation by governmental action." In fact, there has been no official currency devaluation by our government which can be effected by congressional action, and this has not occurred. The defendants do not challenge this, as indeed they cannot; however, they contend that the Commission's position is a "highly technical incorrect position divorced from the realities of the situation"; they point to the actions by the Australian government in revaluing its currency by 6.32% and maintain that this was "governmental action" and falls within Article 23. However, it is unlikely that a

rate agreement written in terms of United States currency was meant to refer to currency devaluation by a government other than that of the United States. In view of the ease and frequency with which other governments throughout the world have taken actions affecting the value of their currencies, it is questionable that the parties would have agreed upon or the Commission approved a rate agreement which could have been so easily and often changed on short notice. This is particularly so since a dual rate agreement is under the close supervision of the Commission; it may be approved only upon a finding that it will not be detrimental to the commerce of the United States, contrary to the public interest or unfair as between shippers, exporters, importers or ports or between exporters from the United States and their foreign competitors. Moreover, the Conference itself recognized that the reference to "governmental action" was to our government, since in its telegram invoking Article 23, it referred only to "the recently announced currency devaluation of the United States dollar by governmental action of the United States of America."

■ The Conference also relies upon actions by the United States Government through the International Monetary Fund, which resulted in certain monetary realignments. However, despite these actions, the simple and undeniable fact is that the United States dollar has not been officially devalued,

10. 46 U.S.C. § 817(b) (4).

11. Omega Importing Corp. v. Petri-Kine Camera Co., 451 F.2d 1190 (2d Cir. 1971) ; Weiss v. Walsh, Docket Nos. 71–1398, 71–1852 (2d Cir., Oct. 29, 1971) ; Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205–1206 (2d Cir. 1970) ; Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323 (2d Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969) ; Clairol Inc. v. Gillette Co., 389 F.2d 264, 265 (2d Cir. 1968) ; Symington Wayne Corp. v. Dresser Industries, Inc., 383 F.2d 840, 841 (2d Cir. 1967) ; Dino de Laurentiis Cinematografica, S.p.A. v. D–150, Inc., 366 F.2d 373, 375 (2d Cir.

1966) ; Unicon Management Corp. v. Koppers Co., 366 F.2d 199, 204–205 (2d Cir. 1966) ; Studebaker Corp. v. Gittlin, 360 F.2d 692, 698 (2d Cir. 1966) ; H. E. Fletcher Co. v. Rock of Ages Corp., 326 F.2d 13, 17 (2d Cir. 1963) ; Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738 (2d Cir. 1953).

Since the Commission is entitled to a preliminary injunction by its clear showing both of probable success on the merits and of irreparable injury if the injunction is denied, it is unnecessary to determine whether the injunction should also issue because the balance of hardships tips decidedly in its favor.

an action which can only be effected by Congress, which has not acted.[12]

A further obstacle to the Conference interpretation of the contract provision is that, having drafted the Agreement, any ambiguity in its terms will be resolved against the Conference.[13] Additionally, since this is a dual rate Agreement, it exists legally only because of approval by the Commission, and the Commission "must be given reasonable leeway in delineating the scope of the agreement and therefore the extent of its prior approval."[14] Thus, were I called upon at this time to make a definitive ruling, I would, upon the papers here presented, hold that Article 23 was not properly invoked as a basis for imposing the currency devaluation charge on a fifteen-day notice. In sum, there is not only a probability of the Commission's ultimate success on this issue, but indeed a great likelihood that its position that the increase was beyond the Shipping Act will prevail.

The issue of irreparable injury is closer. The Commission's focus is on the impact of the proposed increase, which, if permitted to become effective without compliance with the statutory ninety-day notice, would harm American industry, particularly the American importers and manufacturers of wool. The Commission's position, supported by affidavits from representatives of the American wool industry, is that its members have made firm commitments nine to ten months in advance based on the old freight rates, and consequently they will be forced to absorb the surcharge. The industry spokesmen indicate that it generally operates on a marginal profit basis, and the failure of the Conference to give a ninety-day notice would, in light of long-term firm commitments, impose an unanticipated economic hardship by requiring them to absorb the increased freight rates, and would have a devastating effect upon the industry already under severe economic strain. Given ninety days' notice, they say, some adjustments could be made; but on fifteen days' notice, no such accommodation is possible.

The Conference carriers, however, respond that what is involved is a dollar loss which can be compensated and, if the increase is ultimately found to have been illegally imposed upon shippers, recovery can be had by the shippers in an appropriate proceeding;[15] also it has been suggested that a surety bond could be filed by the Conference to guarantee payment of any refunds,[16] whether the result of judicial judgment or Commission action. However, we deal with a sick industry and one whose capacity to survive may be affected by sudden economic pressure. And while it is true that in some instances the availability of monetary damages in the future may ward off injunctive relief,[17] in the in-

12. The Conference fares no better by relying on Article 23's language referring to "regulations of any governmental authority pertaining thereto, or any other official interferences with commercial intercourse arising from the above conditions." It is clear that both clauses apply in those instances where "governmental action" or one of the other specified events have already occurred.

13. Continental Can Co. v. United States, 272 F.2d 312, 315 (2d Cir. 1959).

14. Swift & Co. v. FMC, 113 U.S.App.D.C. 117, 306 F.2d 277, 281 (1962).

15. See Shipping Act, 1916 § 22, 46 U.S.C. § 821; C. Tennant & Sons, Inc. v. New York Terminal Conf., 299 F.Supp. 796, 801–802 (S.D.N.Y.1969); FMC v. Atlantic & Gulf/Panama Canal Zone, 241 F.Supp. 766, 780 (S.D.N.Y.1965).

16. Cf. C. Tennant & Sons, Inc. v. New York Terminal Conf., 299 F.Supp. 796, 803 (S.D.N.Y.1969); Atlantic & Gulf/West Coast of Central America and Mexico Conf. v. United States, 90 F.Supp. 554 (S.D.N.Y.1950) (3-judge court).

17. See Studebaker Corp. v. Gittlin, 360 F.2d 692, 698 (2d Cir. 1966); Foundry Services, Inc. v. Beneflux Corp., 206 F.2d 214, 216 (2d Cir. 1953); Different Drummer, Ltd. v. Textron, Inc., 306 F.Supp. 672, 675 (S.D.N.Y.1969); C. Tennant & Sons, Inc. v. New York Terminal Conf., 299 F.Supp. 796, 801–802 (S.D.N.Y.

stant situation subjecting an ailing industry to the inevitable delays in proceedings to recover the alleged illegal surcharge, even though payment is secured, hardly assures survival.

But more important, there is a public interest aspect which cannot be ignored,[18] and crucial to the determination of the public interest is whether the grant of an injunction will further the statutory purpose. As our Court of Appeals has instructed:

"Good administration of the statute is in the public interest and that will be promoted by taking timely steps when necessary to prevent violations either when they are about to occur or prevent their continuance after they have begun. The trial court is not bound by the strict requirements of traditional equity as developed in private litigation but in deciding whether or not to grant an injunction in this type of case should also consider whether the injunction is reasonably required as an aid in the administration of the statute, to the end that the Congressional purposes underlying its enactment shall not be thwarted."[19]

The Shipping Act provides for the filing of tariffs with specific time requirements before they become effective and the proposed rates legally assessed. In the instant case, to put into effect any increase, the Conference carriers normally would have to file at least a ninety-day notice; however, in reliance upon Article 23 of the Conference Agreement, they claim only a fifteen-day notice is required, a contention, as already noted, that is unlikely to prevail. While the good faith of the carriers in their reliance upon Article 23 is not questioned, in effect their position would allow them to bypass the ninety-day notice provision of the law. If in fact the Conference improperly invoked Article 23, as appears to be the case upon the papers here presented, then the proposed surcharge is unlawful and in violation of the notice provisions of the Act and the Commission properly rejected it.[20] In this circumstance, the Commission, entrusted with its enforcement, is entitled to the requested injunctive relief to prevent frustration of the Congressional policy manifested in the notice provisions of the Act.[21]

Accordingly, the motion for preliminary injunctive relief is granted.

1969) ; FMC v. Atlantic & Gulf/Panama Canal Zone, 241 F.Supp. 766, 780–781 (S.D.N.Y.1965).

18. See Hecht Co. v. Bowles, 321 U.S. 321, 329–330, 64 S.Ct. 587, 88 L.Ed. 754 (1944) ; Shafer v. United States, 229 F. 2d 124, 128 (4th Cir.), cert. denied, 351 U.S. 931, 76 S.Ct. 788, 100 L.Ed. 1460 (1956) ; Walling v. Brooklyn Braid Co., 152 F.2d 938, 940–941 (2d Cir. 1945) ; Atlantic & Gulf/West Coast of Central America and Mexico Conf. v. United States, 90 F.Supp. 554 (S.D.N.Y.1950) (3-judge court).

19. Walling v. Brooklyn Braid Co., 152 F.2d 938, 940–941 (2d Cir. 1945).

20. See Rejection of Tariff Filings of Sea-Land Service, Inc., 13 F.M.C. 200, 201–03 (1970) ; cf. Municipal Light Bd. v. FPC, 450 F.2d 1341, 1345–1346 (D.C. Cir. 1971).

21. The cases cited by the Conference are factually distinguishable and do not require a different result. In FMC v. Atlantic & Gulf/Panama Canal Zone, 241 F.Supp. 766 (S.D.N.Y.1965), where the carriers also attempted to impose increased rates on short notice, the court found the record devoid of any evidence of statutory violations, and the contract clause allowing short notice was far broader than that used in the Agreement here— indeed, the plaintiffs there made no showing that the invocation of such clause was not warranted. Id. at 782. In C. Tennant & Sons, Inc. v. New York Terminal Conf., 299 F.Supp. 796 (S.D.N.Y.1969), there was no showing of irreparable injury nor of any harm to the public interest. In neither case did the Commission reject the proposed increase as void and find its use unlawful.