**PENNSYLVANIA MOTOR TRUCK ASSOCIATION et al.,**

v.

**PORT OF PHILADELPHIA MARINE TERMINAL ASSOCIATION et al.**

Civ. A. No. 27904.

United States District Court
E. D. Pennsylvania.

May 19, 1960.

Paul F. Barnes, Philadelphia, Pa., for plaintiffs.

Francis A. Scanlan and Robert G. Kelly, Philadelphia, Pa., for defendants.

David Berger, City Sol., by Levy Anderson, First Deputy City Sol., Philadelphia, Pa., for City of Philadelphia.

James J. Leyden, Philadelphia, Pa., for Motor Transport Labor Relations, Inc.

Richard H. Markowitz, Philadelphia, Pa., for Highway Truck Drivers & Helpers, Local 107, Internatl. Brotherhood of Teamsters.

Abraham E. Freedman, Philadelphia, Pa., amicus curiae.

LORD, District Judge.

This is an equity proceeding in which the plaintiff and defendant by their respective applications for a Preliminary Injunction and a Motion to Dismiss, have brought the following issues before the Court: (1) Does the Court have jurisdiction to enjoin the sudden imposition by pier operators of a compulsory truck loading and unloading regulation which abrogates a long standing practice of truckers' choice in the Port of Philadelphia, where the only relief sought is the maintenance of the status quo pending an administrative determination on the merits of the regulation by the Federal Maritime Board?; and (2) Assuming such jurisdiction, upon a balancing of the equities, has the plaintiff shown that irreparable harm will result without injunctive relief?

Plaintiff, Pennsylvania Motor Truck Association, (P.M.T.A.) is a non-profit corporation, comprising some 3,500 members of which a substantial number are truckers, shippers and consignees regularly utilizing the facilities and services of the marine terminals of the Port of Philadelphia. Defendant, Port of Philadelphia Marine Terminal Association (Terminal Operators), is comprised of operators of many of the marine terminals of the Port of Philadelphia so utilized by the members of the P.M.T.A. The operations of both parties to this litigation have a great impact on the movement of goods in both interstate and foreign commerce.

The City of Philadelphia has appeared in these proceedings as *amicus curiae*. In this regard, the City is rightly concerned with the smooth and continued flow of cargo into and through the Port of Philadelphia. Further, not only does the City have an investment of approximately $50,000,000 in the Port of Philadelphia, but it is also deeply concerned with port operations as they affect industrial development, and the economic well-being of thousands of its citizens.

### Federal Maritime Board Agreement No. 8425 and Terminal Tariff No. 1

Believing that marine terminal operations in the Port of Philadelphia might best be managed by the establishment of uniform rates and practices, seventeen members of the defendant association submitted an Agreement to the Federal Maritime Board for approval on August 13, 1959. The Agreement, submitted in accordance with § 15 of the Shipping Act of 1916, as amended, was finally approved by the Board on December 21, 1959, as Federal Maritime Board Agreement No. 8425. The Agreement, as approved, exempts the seventeen signatories thereto from the operation of the anti-trust laws of the United States. 46 U.S.C.A. § 814.

As pertinent to practices relating to the loading and unloading of trucks at marine terminals in the Port of Philadelphia, Agreement No. 8425 provides:

"Third: this agreement shall cover the following subject matters and all services, facilities, rates, and charges incidental thereto: wharfage, dockage, railroad carloading and railroad car unloading, lighterage loading and lighterage unloading, *truck loading and truck unloading*, free time, and wharf demurrage." [Emphasis supplied.]

Following the approval of the Agreement, conferences were held by the seventeen signatories who are all members of the defendant association. As a result of these meetings, "Terminal Tariff No. 1" was promulgated. Section VII (5) of this tariff contains the disputed provision which initiated this litigation. It provides:

"(5) Right to Load or Unload Trucks:

"All truck loading and unloading at any pier or waterfront terminal operated by a participating Terminal Operator in the Port of Philadelphia who is a party to this Tariff shall be performed *solely* by such Terminal Operator, his agents, servants and employees at the rates and subject to the rules, regulations and practices contained in this Tariff.

"The trucker, shipper or consignee shall provide a truck or other vehicle which is adequate and suitable for safe loading or unloading." [Emphasis supplied.]

Terminal Tariff No. 1 was formally filed with the Federal Maritime Board on March 31, 1960. On the same date, March 31, 1960, the tariff was for the first time distributed to parties in interest and this date likewise constituted the first public notice of the promulgation of the compulsory truck loading and unloading requirement.

The tariff became effective April 1, 1960.

### Jurisidiction

On the effective date of the tariff, April 1, 1960, the plaintiff filed a complaint with the Federal Maritime Board charging, inter alia, that defendant's

tariff violates the provisions of the Shipping Act of 1916, as amended. Defendant has filed an answer to plaintiff's complaint and both parties have requested an immediate disposition of the controversy by the Board.

In this posture of the case, the prayer of plaintiff's Complaint, is as follows:

"That this Court enter an injunction directing defendants to cancel and withdraw their exclusive loading and unloading rule as contained in subparagraph 5, Section VII, and to permit motor carriers and shippers to load and unload their vehicles on waterfront terminals maintained by defendant Terminal Operators as such practice existed prior to March 1959, and to maintain [the] status quo pending action by the Federal Maritime Board on the Complaint now pending before it."

The plaintiff likewise alleges that irreparable harm will result to it and its members unless such equitable relief as prayed for in the Complaint is afforded. This aspect of the case will be discussed hereinafter.

At the outset, all parties agree that the jurisdiction to pass upon the *merits* of the basic controversy between the parties lies initially in the Federal Maritime Board, and not this Court. The thrust of defendant's argument however, is summed up by the following statement from their brief: (p. 13)

" * * * it is clearly established that in proceedings of this type wherein violations of the Shipping Act are averred the Federal Maritime Board has primary and exclusive jurisdiction, and the [Terminal Operators] herein must exhaust their administrative remedies before the Board before they are entitled to any judicial relief."

In short, it is the defendant's contention that the doctrines of "primary jurisdiction" and "exhaustion of administrative remedies" deprive this Court of jurisdiction. The controlling issue in this regard however, is whether the instant action is of the *type* which is subject to the above doctrines.

Plaintiff seeks in this action but one type of relief—the maintenance of the status quo. The hub of its plea is that the Federal Maritime Board cannot, or will not, stay the enforcement of the disputed provision of the tariff pending its determination. See Pacific Coast European Conference—Payment of Brokerage, 4 FMB 696 (1955), and 5 FMB 65 (1956); Isbrandtsen Co. v. United States, D.C.S.D.N.Y.1948, 81 F.Supp. 544. In any event, regardless of the power of the Board, no steps have been taken by the Board to stay the imposition of § VII (5) pending a determination on the merits. Plaintiff, therefore, seeks the assistance of this Court merely as an aid in the administrative process.

The plaintiff has pleaded, inter alia, that this Court has jurisdiction by virtue of § 1337 of the Judicial Code, 28 U.S.C.A. § 1337. This section provides:

"The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies."

For reasons to be more fully developed hereinafter, the Court holds that this action arises under the Shipping Act of 1916, as amended, 46 U.S.C.A. § 801 et seq. and in accordance with § 1337 jurisdiction rests in this tribunal.

As pertinent to the issues of this case, § 15 of the Shipping Act, 46 U.S.C.A. § 814 provides:

"All agreements, modifications, or cancellations made after the organization of the [Federal Maritime] Board shall be lawful only when and as long as approved by the Board, and before approval or after disapproval it shall be unlawful to carry out in whole or in part, directly or indirectly, any such agreement, modification, or cancellation."

The clear wording of the above provision makes unlawful the carrying out of

"all agreements, modifications, or cancellations" *until* approval has been procured from the Federal Maritime Board.

■ The issue is: Can this Court determine whether the disputed provision of the tariff is an "agreement", "modification" or "cancellation" as those terms are employed in § 15 of the Shipping Act? Without doing violence to the role of the administrative agency in the judicial process, this Court concludes that such a determination can be made under the circumstances of this case. This conclusion is predicated upon the fact that the decision called for in the instant controversy is in no way contingent upon the expertise of the Federal Maritime Board.

■ The compulsory unloading and loading provision as embodied in § VII (5) first appeared in the Terminal Tariff No. 1 which was filed by the Terminal Operators on March 31, 1960—to be effective the next day. It did not appear in the Section 15 Agreement which preceded the filing of the tariff and there was no indication in that agreement that free choice loading and unloading practices which had heretofore existed in the Philadelphia Port would be changed.

Defendant's contention that the basic agreement constituted notice to the plaintiff that such a change in a longstanding practice was contemplated is without merit. At best, the provision of the Section 15 Agreement relating to truck loading and unloading, supra, amounted to an agreement to make an agreement in relation to such practices *in futuro*. Indeed, this conclusion is supported by the defendant's brief, having in mind that the Section 15 Agreement was approved December 21, 1959. Defendant's brief states:

"* * * [O]n January 6, 1960, the [Terminal Operators] met for the *first time* to discuss among themselves the rates, charges, rules and regulations to be included in the Association's tariff. The [Terminal Operators] were advised by counsel that because of the specific exemption granted to them from the Anti-Trust Acts that no person other than the signatories to the agreement could participate in the discussions of the signatories relating to the establishment of uniform rates, charges, rules and regulations." [Emphasis supplied] [Brief of Terminal Operators filed in the Court of Appeals, and in this Court, page 4].

■ In the same manner, defendant's contention that the approval of the basic agreement constituted approval by the Board for the promulgation of § VII (5) of the Tariff must also fail. As noted by the Court in Isbrandtsen Co. v. United States, 1954, 93 U.S.App.D.C. 293, 211 F.2d 51, at page 56:

"It [The Federal Maritime Board] maintains that the basic Conference agreement carries with it the 'cover of authority' for subsequent changes of rates since the language of the basic agreement is as broad as that of the statute itself. If this is so, then no additional approval would be necessary to allow the dual rate system to go into effect.

\* \* \* \* \* \*

" 'Agreements' referred to in the Shipping Act are defined to include 'understandings, conferences, and other arrangements.' Clearly, a scheme of dual rates like that involved here is an 'agreement' in this sense. It can hardly be classified as an interstitial sort of adjustment since it introduces an entirely new scheme of rate combination and discrimination not embodied in the basic agreement. But even if it were not a new agreement, it would certainly be classed as a 'modification' of the existing basic agreement. In either case, § 15 requires that such agreements or modifications 'shall be lawful only *when* and as long as *approved*' by the Board. Until such approval is obtained, the Shipping Act makes it illegal to institute the dual rate system."

While the Court there found jurisdiction to act as the reviewing tribunal from a "final order" of the Federal Maritime Board, the Court nevertheless determined for itself that the dual rate system had not been "approved" by the Board, and constituted either an "agreement" or a "modification" of the existing basic agreement.

An examination of Agreement No. 8425 in comparison with § VII (5) of the Tariff, and a consideration of the background under which the mandatory loading and unloading provision was promulgated, reveals that § VII (5) was not issued under the "cover of authority" granted in the basic agreement. Nor is the compulsory regulation a mere "interstitial sort of adjustment."

In this state of the record, it is clear that the Federal Maritime Board has not approved § VII (5) of the tariff. As stated in River Plate and Brazil Conferences v. Pressed Steel Car Co., 2 Cir., 1955, 227 F.2d 60, at page 63:

> "This case presents no questions for determination by a Board of special competence to which Congress has committed questions requiring administrative expertise. When all that remains is for the Court to say what the plain words of the statute mean and whether the Board has acted, the doctrine of primary jurisdiction does not apply. Cf. Great Northern Ry. Co. v. Merchants Elevator Co., 1922, 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943. On the facts before us the question of approval is no more difficult than the score of yesterday's baseball game; the court can read the score as well as the Board. * * *"

See also Isbrandtsen Co. v. United States, D.C.S.D.N.Y.1948, 81 F.Supp. 544, appeal dismissed A/S J. Ludwig Mowinckels Rederi v. Isbrandtsen Co., 1949, 336 U.S. 941, 69 S.Ct. 813, 93 L.Ed. 1099, wherein the District Court granted plaintiff's Motion for a temporary restraining order and a temporary injunction restraining the defendant conferences and steamship lines from carrying out their announced intention to institute a dual rate system. Nor does this Court pass upon the merits of the controversy between the parties to this litigation. As stated in Isbrandtsen Co. v. United States, supra, 81 F.Supp. at pages 546–547:

> "* * * We should not at this stage pass on the validity of the agreements before the Commission, in accordance with its established procedure, has had an opportunity to pass thereon in an adversary proceeding.
>
> "But were the defendant carriers to institute their exclusive patronage system pending the Commission's decision upon such a proceeding, the plaintiff would be gravely prejudiced. Since the Commission disclaims the power to afford temporary relief, and the equitable power of the court to preserve the status quo to protect the rights of all concerned has not been withdrawn by statute, an injunction as prayed should issue, conditioned on the plaintiff's diligent prosecution before the Commission of a complaint challenging the validity of the agreements. The defendant carriers' motion to dismiss the action is denied."

■ Likewise, the Court rejects the defendant's contention that this controversy must first be submitted to the Federal Maritime Board under the doctrines announced by the Supreme Court in United States Navigation Company v. Cunard S.S. Co., 1932, 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408, and Far East Conference v. United States, 1952, 342 U.S. 570, 72 S.Ct. 492, 494, 96 L.Ed. 576. In these cases the Supreme Court held that district courts have no jurisdiction in *anti-trust suits* to determine the substantive legality or propriety of conference agreements or rates. Such issues are within the exclusive competence and primary jurisdiction of the expert administrative agency—the Federal Maritime Board. But, in those cases there was no question raised as to the propri-

ety of the Court in issuing an injunction to hold the matter in status quo. In the Far East case, supra, the Court made it unequivocally clear that the basis for applying the doctrine of primary jurisdiction to deny initial jurisdiction in the district court was predicated upon the issues there presented. Justice Frankfurter, in speaking for the Court, summed up and reaffirmed the purport of the Cunard case as follows:

"The Court thus applied a principle, now firmly established, that in cases raising *issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion,* agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined." [1] [Emphasis supplied.]

Furthermore, while the Court in Far East held "that initial submission to the Federal Maritime Board is required", Justice Frankfurter went on to say:

" * * * we may either order the case retained on the District Court docket pending the Board's action, General American Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. 422, 432–433 [60 S.Ct. 325, 331, 84 L.Ed. 361]; El Dorado Oil Works v. United States, 328 U.S. 12, 17 [66 S.Ct. 843, 846, 90 L.Ed. 1053]; see United States v. Interstate Commerce Commission, * * [337 U.S. 426] at page 465, note 12, 69 S.Ct. 1430, or order dismissal of the proceeding brought in the District Court." 342 U.S. at pages 576–577, 72 S.Ct. at page 495.

Defendant's reliance on United States Trucking Corp. v. American Export Lines, Inc., D.C.S.D.N.Y.1956, 146 F. Supp. 924, is also misplaced. On the contrary, this case expressly acknowledged the continuing vitality of prior holdings that a district court has jurisdiction to maintain the status quo by enjoining conference agreements pending administrative proceedings before the

---

1. 342 U.S. at page 574, 72 S.Ct. at page 494. See River Plate and Brazil Conferences v. Pressed Steel Car Co., supra., 227 F.2d at page 63, wherein the Court in discussing the Cunard and Far East cases held: "Two decisions of the Supreme Court much relied upon by the plaintiffs are not in point. * * * In each case the plaintiff alleged a conspiracy in violation of the anti-trust laws and that the defendant conference's unfiled agreement violated the Sherman Act. Thus it was not enough in those cases to show that the agreement was unlawful under the Shipping Act; the Court had the additional question whether the conduct complained of was within the prohibition of the anti-trust laws. That inquiry involved substantially the same factual issues as those which were within the special competence of the Shipping Board under the Shipping Act. * * * "

See also West India Fruit & Steamship Co. v. Seatrain Lines, 2 Cir., 1948, 170 F.2d 775, 779, certiorari denied 1949, 336 U.S. 908, 69 S.Ct. 514, 93 L.Ed. 1072, wherein the court affirmed a district court's grant of a temporary injunction against a steamship company's putting into effect rate reductions pending determination by the Maritime Commission of a complaint before it. The Court stated: " * * * We consider inapposite U. S. Navigation Co. v. Cunard, 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408. That decision imposed limitations on the power of the courts to interfere with the exercise of an administrative agency's powers. *Here the court was asked to assist the Commission by preserving the status quo until it could determine* whether it had statutory jurisdiction, and, if so, how it should act. * * * [Emphasis supplied.]

The comment by Professor Davis is likewise illuminating: "If in the Far East case the Government had sued to enjoin operation under an unapproved agreement in violation of the Shipping Act, instead of to enjoin violation of the Sherman Act, the primary jursidiction doctrine would not have prevented issuance of the injunction, for no question would have been presented over which the Board had jurisdiction." 3 Davis, Administrative Law § 19.06 n. 26 (1958).

Board to determine their validity. At page 925, the Court specifically stated:

"Plaintiffs, in this motion, challenge no order or decision of the board nor do they ask the court to declare the rates and practices of Tariff No. 3 illegal. They seek merely the maintenance of the status quo of the date of the board's order of inquiry, during the pendency of the administrative proceedings, and the injunction requested is said to be in aid of the board's processes. It has been held that such a temporary injunction may be granted by the court in the exercise of its equity powers. West India Fruit & Steamship Co. v. Seatrain Lines, 2 Cir., 170 F.2d 775; Isbrandtsen Co. v. United States, D.C., 81 F.Supp. 544. * * *"

True it is that the Court in that case did not grant the relief prayed for. However, the final decision was based on a balancing of the equities, the Court never for a moment expressing a lack of power to act if action was necessary. See United States Trucking Corp. v. American Export Lines, Inc., D.S.S.D. N.Y.1956, 148 F.Supp. 61.

This Court also rejects the other principal cases cited by the defendant as being precedents controlling the disposition of the instant controversy.[2]

### Irreparable Harm

Having concluded that this Court has jurisdiction to act in the instant cause, the next question to be determined is whether the plaintiff, upon a balancing of the equities, will suffer irreparable harm unless injunctive relief is granted until the Board acts.

To adequately determine this issue, the Court held extensive hearings for a number of days. Both sides introduced evidence as to the issue of irreparable harm. After a careful consideration of the entire record, the Court concludes that the plaintiff would suffer irreparable harm unless equitable relief is granted.

Initially, the evidence adduced at the hearings makes it abundantly clear that prior to April 1, 1960, it was optional with truckers whether they wished to load and unload their own trucks or desired to have this service performed by the Terminal Operators. Further, the first public notice of the institution of the compulsory truck loading and unloading requirement, as previously noted, was on March 31, 1960. The evidence indicated that in view of the sudden imposition of the mandatory regulation—it became effective on only one day's notice—there was a serious disruptive effect on port commerce because of the uncertainty and confusion on the part of shippers and other port users. This disruptive effect on the movement of commerce in the Port of Philadelphia is attributable to the sudden imposition of the loading and unloading regulation and extra charge without sufficient notice to afford the parties affected an opportunity to make the necessary adjustments in rates and cost of goods as required.

From the evidence it would appear that the compulsory loading and unloading of trucks by pier operators will not result in any reduction of the cost of transportation by truckers for the reason that the same number of truck drivers and helpers are required by the truckers as previously. Likewise, the increased charge on shippers and consignees as a result of the regulation, will seriously affect the competitive position of many of them. As a result, members of the plaintiff association stand to lose a substantial part of their business, should such shippers or consignees either manufacture their products in other plants, or divert the shipment of their goods to other means of transportation.

On the other hand, there is no substantial evidence in the record as to the

**2.** Federal Maritime Board v. Isbrandtsen Co., 356 U.S. 481, 78 S.Ct. 851, 2 L.Ed. 2d 926; Rivoli Trucking Corp. v. American Export Lines, Inc., D.C.E.D.N.Y. 1958, 167 F.Supp. 937; Rivoli Trucking Corp. v. New York Shipping Ass'n, D.C. S.D.N.Y.1956, 167 F.Supp. 940 and D.C. S.D.N.Y.1957, 167 F.Supp. 943.

total cost to the Terminal Operators in performing the loading and unloading services or whether the rates for loading and unloading set forth in the tariff will result in any net profit.[3] They did submit evidence of loss of gross revenue during the time a temporary restraining order was in effect. Further, the Terminal Operators introduced evidence indicating that their marine terminal operations are not on the soundest of financial footing and they require more income from operations to continue to exist. In this regard, the evidence indicates that in the past few years the Terminal Operators have experienced a significant increase in their costs relating to labor, maintenance and repair, and dredging operations. However, an over-all appraisal of the situation finds the equities in favor of the plaintiff pending the Board's final determination on the merits.

As a ground for denying equitable relief, the defendant maintains that the Federal Maritime Board can grant reparation orders against the Terminal Operators in favor of those parties paying for services in compliance with § VII (5) of the tariff. This possibility is no basis for denying equitable relief under the circumstances here. Enforcement of this tariff regulation would necessarily, and already has, created disruptions in the truckers', shippers' and consignees' business, with a real question as to whether there will be a substantial decline in the tonnage handled by the Port of Philadelphia. Monetary reparations would not be an adequate remedy. Further, the regulation has caused disruptions of the truckers' relationships with both their shipper customers and their employees, who in large part are covered by collective bargaining agreements between the truckers and various locals of the Teamsters Union. There was testimony as well that if the regulation

is put into effect, the truckers' requirements as to equipment and labor would have to be adjusted downward.

It is also to be noted that there is a serious question as to whether the Federal Maritime Board will eventually approve the entire tariff provision for exclusive truck loading and unloading by the Terminal Operators. In this regard, the Court notes that the pier operators in the Port of New York also attempted to impose a requirement that all truck loading and unloading be performed by them. The Federal Maritime Board, after full hearings, rejected this contention and ordered that truckers' choice continue as to unloading. Empire State Highway Transportation Ass'n v. American Export Lines, Inc., 5 F.M.B. 565, 592 (1959). This observation by the Court however, is not to be considered as an expression of opinion as to the *merits* of the regulation as it pertains to the Port of Philadelphia. The Court does deem it important, however, in regard to the question of balancing the equities in this proceeding, and has considered the matter in that light only.

In conclusion, the Court finds that the plaintiff is entitled to equitable relief enjoining the enforcement of § VII (5) of Terminal Tariff No. 1 pending the approval of that provision by the Federal Maritime Board. In so acting, the Court is utilizing the preliminary injunction as a recognized tool to maintain the status quo until the ultimate substantive issues between the parties can be determined in an orderly manner in a proper administrative proceeding.

This opinion shall constitute the Court's Findings of Fact and Conclusions of Law.

For the foregoing reasons, Defendant's Motion to Dismiss is Denied. Let the Plaintiff submit an order for a Preliminary Injunction.

---

3. The Tariff provides for a charge of 6½¢ per cwt. for partial or tailgate loading and unloading and 13¢ per cwt. for full loading or unloading, with a minimum charge for partial or tailgate loading or unloading of $2.00 per truck and for full truck loading or unloading $4.00 per truck.