**DELAWARE RIVER PORT AUTHORITY**
et al., Plaintiffs,

v.

**UNITED STATES LINES, INC., et al.,**
Defendants.

Civ. A. No. 71–1725.

United States District Court,
E. D. Pennsylvania.

Sept. 1, 1971.

Martin Heckscher, Herbert Smolen, M. Carton Dittmann, Jr., Abraham E. Freedman, Francis A. Scanlan, Philadelphia, Pa., Gordon Shaw, Washington, D. C., for plaintiffs.

Harrison G. Kildare, Raymond K. Denworth, Jr., Philadelphia, Pa., Marjorie Marinoff, Gordon Gallon, Washington, D. C., Allan Berdon, New York City, Charles Warren, Washington, D. C., Raymond T. LeTulle, John T. Biezup, Alfred J. Kuffler, Raymond K. Denworth, Jr., Philadelphia, Pa., for defendants.

## OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

VANARTSDALEN, District Judge.

Plaintiffs have moved for a preliminary injunction. Hearing has been held, briefs filed, and oral argument heard on the motion. Plaintiffs seek a preliminary and thereafter a permanent injunction until a final decision is rendered by the Federal Maritime Commission on a complaint filed before it by plaintiffs against defendants alleging illegal and discriminatory shipping practices against the Port of Philadelphia. Plaintiffs assert that unless such injunctive relief is granted promptly, the alleged illegal shipping practices will have a disastrous effect upon the Port of Philadelphia, thereby causing irreparable harm to all plaintiffs and to many, if not all, citizens and residents of the Philadelphia Port area. The pertinent allegations of the complaint are set forth as follows:—

"12. Each of the defendants has in the past or is continuing at present to divert or to attempt to divert cargo away from the Port of Philadelphia, to other ports of exit or entry, as is more fully set forth in Exhibit "A" to this Complaint, which is a Complaint against these practices filed by plaintiffs with the Federal Maritime Commission.

"13. The foregoing actions of defendants are unlawful and illegal under Sections 15, 16, 17 and 18 of the Shipping Act, 1916 and Section 8 of the Merchant Marine Act of 1920, and under the general laws (including anti-trust laws) and Constitution of the United States.

"14. Plaintiffs have filed with the Federal Maritime Commission a Complaint referred to above, a copy of which is attached and marked Exhibit "A". The Federal Maritime Commission does not have the power to prohibit the diversion of cargo from Philadelphia to other ports of exit and entry during the pendency of the proceeding before it or before any appellate court reviewing its decision.

"15. The diversion of cargo from Philadelphia to other ports of entry or exit during the pendency of the proceeding before the Federal Maritime Commission will drastically alter previously established patterns of commerce by diverting traffic from areas naturally tributary to the Port of Philadelphia away from the said Port through defendants' diversionary activities.

"16. If cargo is diverted from Philadelphia during the pendency of the proceeding before the Federal Maritime Commission as aforesaid, irreparable injury will be done thereby to the Port of Philadelphia, plaintiffs, longshoremen, other persons and businesses interested in and dependent upon the said Port, and the general public, as follows:

"a. Loss of job opportunities, employment, wages and employment benefits by longshoremen and other workers dependent either directly or indirectly on activity in the port; loss of economic livelihood to a great many families within the Port of Philadelphia whose breadwinners are workers and longshoremen dependent for their employment on activity

in the port; and a drastic curtailment of the pension and welfare programs of the unions of said workers and longshoremen which depend for their vitality upon full employment of their members.

"b. Placing in jeopardy the investment by local and state governments, private concerns and individuals in the facilities of the Port of Philadelphia;

"c. Substantial and continuing loss of tax revenue by the Commonwealth of Pennsylvania, States of New Jersey and Delaware, Cities of Philadelphia, Trenton, Camden, Gloucester, Paulsboro and Wilmington, and other governmental entities.

"d. Substantial impairment in the value of the port facilities located in the cities and states referred to above.

"e. Change in long-established patterns of traffic so that the Port of Philadelphia will be critically damaged or destroyed as a viable economic operation and will no longer be in a position to service and handle cargo to and from areas naturally tributary to the said Port.

"f. Creation of an undue concentration of shipping services in one or at most two areas in the North Atlantic range of ports contrary to the policies of the Congress as set forth in its various Acts, including, inter alia, Section 8 of the Merchant Marine Act of 1920, which are intended to encourage the development of ports and transportation facilities adequate to handle interstate and foreign commerce in peace time and to enhance the security of the United States in times of national emergency.

"17. Should cargo continue to be diverted from the Port of Philadelphia during the pendency of the proceeding before the Federal Maritime Commission, it will be difficult, if not impossible, for the original patterns of commerce to be restored at the conclusion of the said proceeding.

"18. The status quo must be preserved as it existed prior to the attempted diversion of cargo away from Philadelphia as an aid to the administrative processes of the Federal Maritime Commission.

"19. There is no remedy other than an injunction to prevent the diversion of cargo from the Port of Philadelphia and to prevent irreparable damage to plaintiffs and the interests they represent."

On motion by plaintiffs, a temporary restraining order was entered on July 13, 1971, against all defendants. The order restrained the defendants or any persons acting in concert with them " * * * from taking action to divert cargo from the Port of Philadelphia by way of substituted service, absorption of inland transportation charges; or any other illegal diversionary actions, pending further order of this court." A brief hearing on the motion for the preliminary injunction was held on July 15, 1971, but was continued on motion of several of the defendants in order to allow defense counsel sufficient time to undertake discovery and prepare defenses. All parties agreed to extend the temporary restraining order until August 10, 1971, at which time the motion for a preliminary injunction was rescheduled to be heard. On July 20, 1971, the temporary restraining order was amended to exclude cargo in transit as of the date of entry of the temporary restraining order. By the time of the hearing on the present motion on August 10, 1971, the plaintiffs voluntarily dismissed the Complaint against Spanish North American Line and had stipulated with eight other defendants to vacate the temporary restraining order as to them, provided the defendants would not engage in any conduct prohibited by the terms of the temporary restraining order without first giving thirty days' notice to each plaintiff. At the August 10th hearing the only remaining defendant who had not

joined in the stipulation was American President Lines, Ltd.

On July 14, 1971, the Federal Maritime Commission entered an appearance as amicus curiae, and has participated actively on behalf of the plaintiffs through presentation of oral argument, submission of memoranda of law and participation in examination of witnesses, urging the Court to grant an injunction in order to preserve the status quo, until the merits of the issues can be determined by the Federal Maritime Commission.

## FINDINGS OF FACT

1. Plaintiffs, Delaware River Port Authority, City of Philadelphia, and Philadelphia Port Corporation are each public corporate bodies having a direct interest in port facilities of the Port of Philadelphia.

2. Plaintiffs, International Longshoremen's Association — Philadelphia District Council, Philadelphia Marine Trade Association, and Port of Philadelphia Marine Terminal Association are various associations having direct interests in the port facilities of the Port of Philadelphia.

3. All defendants are shipping companies involved in carrying of freight by water.

4. The complaint against the defendant, Spanish North American Line, was dismissed by plaintiffs.

5. All other defendants, except American President Lines, Ltd., have entered into stipulations, not to engage in any of the practices which plaintiffs seek to enjoin without first giving plaintiffs thirty days prior notice. With such stipulations of record, plaintiffs presently seek a preliminary injunction only against American President Lines, Ltd., the only defendant unwilling to agree to discontinue the challenged practices.

6. Plaintiffs have filed a complaint, dated July 9, 1971, before the Federal Maritime Commission against all of the defendants in this action seeking a ruling by the Federal Maritime Commission that the practices alleged in the complaint are illegal and in violation of statutory authority and that the Federal Maritime Commission prohibit defendants from continuing such practices.

7. The Port of Philadelphia includes all docking facilities and port facilities in the Delaware Bay and Delaware River from Cape May, New Jersey to Trenton, New Jersey, including both sides of the bay and river. It includes among others the Cities of Philadelphia, Camden, Wilmington and Chester.

8. The Port of Philadelphia handles approximately 3 million tons of export cargo and 2 million tons of import cargo per year. Approximately 100,000 employees are directly dependent upon the port for their jobs and occupations.

9. For every ton of cargo handled through the Port of Philadelphia there is generated $26 of business for the community. For each ton of cargo so handled there is also approximately $1.00 in state taxes and $1.00 in local taxes collected.

10. Various private and public agencies have an investment of approximately $50,000,000 in old existing port handling facilities, and approximately $50,000,000 in newly constructed facilities which make the port fully modernized for handling cargo including cargo from container ships.

11. During the year last past ending with the date of July 11, 1971, the total number of hours worked by longshoremen in the Philadelphia Port Area was approximately 1,400,000 hours less than an equal period the prior year. This reduction in man hours causes loss to the longshoremen's pension funds; annual income, vacation and welfare funds and similar benefits. Approximately 2,500 longshoremen are directly dependent on the Port of Philadelphia for their employment.

12. From 1951 through to approximately 1960, the defendant, American President Lines, Inc., did not have ships enter the Port of Philadelphia. It accepted cargo for Philadelphia destination,

but unloaded in other ports and paid the inland freight charges to Philadelphia.

13. In early 1960 through 1968, American President Lines, Ltd., did have ships dock in Philadelphia for purposes of discharging cargo. This practice was discontinued around 1968 because the defendant found it uneconomical to discharge the small amount of freight in Philadelphia. The practice since 1968 has been to discharge cargo bound for the Philadelphia area in other ports, usually Port Newark, and trans-ship by motor freight to ultimate destination, American President Lines, Ltd., itself paying the additional inland freight differential. It is this practice that plaintiffs challenge as being an illegal diversion of cargo away from the Port of Philadelphia.

14. One ship of American President Lines, Ltd., docked in Philadelphia and discharged some cargo during the summer of 1970.

15. American President Lines, Ltd., advertises no ships as docking in Philadelphia, solicits no foreign freight for delivery to Philadelphia, but does accept freight bound for Philadelphia when requested by customers.

16. Approximately 40 ships of American President Lines, Ltd., have within the last year discharged cargo destined for Philadelphia, at ports other than Philadelphia, and absorbed the inland freight differential. The total freight charges, gross, received by American President Lines, Ltd., for this cargo was approximately $55,000.00. No one ship contained any substantial portion of its load of cargo, as cargo destined for the Philadelphia area. Most of the cargo was in small odd lots. The ships were general cargo ships.

17. A substantial portion of the cargo imported by American President Lines, Ltd., bound for Philadelphia, involved personal property of returning overseas military and governmental personnel, the cost of which freight is paid by the United States Government. This freight must be carried in American flag ships. Most of this cargo, although not aboard a container ship, was shipped in containers easily transferred to motor freight for trans-shipment.

18. The cost of bringing a ship to Philadelphia to discharge any cargo is approximately $6,000.00, but a substantial portion of such costs would be incurred irrespective of what port the ship discharged cargo. This cost includes a commission paid Norton-Lilly Company, the local agent for American President Lines, Ltd., which commission is based on the gross freight charges to the customer on the cargo discharged.

19. The estimated minimum time required before the Federal Maritime Commission may reach a final decision on the complaint of plaintiffs against defendants pending before it is one year.

20. American President Lines, Ltd., intends, unless enjoined by the Court, to continue to accept, carry and discharge in Port Newark or other ports other than Philadelphia, cargo destined for the Philadelphia area, and absorb the inland freight charge differential.

21. Many of the competing shipping lines for the cargo so imported by American President Lines, Ltd., except for the personal belongings cargo referred to in Finding No. 17, are foreign flag ships.

22. The present practices of American President Lines, Ltd., with respect to import cargo bound for the Philadelphia area just recently came to the knowledge of plaintiffs, who promptly took action to compel discontinuance.

23. The Federal Maritime Commission has filed an appearance and has filed a brief and taken an active part in seeking to obtain a preliminary injunction.

24. The challenged practices of American President Lines, Ltd., has heretofore caused substantial injury and damage to plaintiffs and the Port of Philadelphia which cannot be accurately determined in a monetary amount, and which is irreparable.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and the subject matter.

2. Plaintiffs will suffer immediate and irreparable harm if American President Lines, Ltd., is permitted to continue its present practice of discharging import cargo destined for the Philadelphia Port Area at ports other than Philadelphia, and absorbing the inland freight differential.

3. The merits of whether the present practice of American President Lines, Ltd., in discharging import cargo destined for the Philadelphia Port Area at ports other than Philadelphia, and absorbing the inland freight differential is illegal, is to be determined in the first instance by the Federal Maritime Commission.

4. A preliminary injunction would impose the status quo existing prior to the time of the alleged illegal conduct by American President Lines, Ltd.

## DISCUSSION

As a result of the hearing on August 10, 1971, the testimony indicates that the only portion of the temporary restraining order that would directly effect American President Lines, Ltd., is the prohibition against the absorption of inland transportation charges arising from the import shipment of cargo ultimately destined to the Philadelphia area which was diverted from the Port of Philadelphia and imported through other ports. The Port Authority deemed such a diversion to occur whenever cargo ultimately bound for a destination within an approximate fifty mile radius of the Philadelphia Port Area was shipped to another port and was then shipped inland to the point of destination, the inland transportation cost differences from Philadelphia to ultimate destination, and port of entry to ultimate destination being borne by defendant.

The defendant's witness, Mr. Schaap, testified that American President Lines, Ltd., had been accepting cargo bound for Philadelphia and landing such cargo in other ports and assuming the inland transportation costs off and on for twenty years. From 1951 through the late 1950's this practice was followed and its import cargo did not enter the Port of Philadelphia. Beginning in the early 1960's through 1968, the Line did utilize the Port of Philadelphia for import cargo. However, since 1968, it has reverted to the former practice. Mr. Schaap further testified that the Line did not seek nor solicit for cargo bound for Philadelphia but that it did take such cargo as a matter of accommodation to its customers. As a result, defendant contended that only an insignificantly small amount of cargo ("de minimis") would be aboard any ship, and it was not economical to enter the Port of Philadelphia to unload it. Many of the docking and pilot fees incurred are fixed and discourage entrance of less than a full shipload or a substantial quantity of cargo. Thus, the practice was to unload these small amounts of cargo at Port Newark and absorb the cost of transporting the cargo by truck or train to the Philadelphia area. It was admitted that since June of 1970, approximately 40 importing shipments had been so diverted.

Upon these facts the defense argues that it has been following this practice off and on for twenty years because it is the only economically feasible method of accommodating its customers in importing the small amounts of cargo to the Philadelphia area. The defense claims that to grant the preliminary injunction would cause them irreparable harm and would alter the status quo. In addition, the defense claims that it diverted so little cargo that it could not be causing any measurable and certainly no irreparable harm to the Port.

The plaintiffs, representing many diverse parties with legitimate interests in the Port of Philadelphia, presented considerable convincing testimony supporting the allegation of irreparable harm from the diversion of any cargo from the Port of Philadelphia. It was contended that any diversion under these

circumstances was unlawful and was irreparably harmful in at least some degree. In addition, should any shipping company be able to divert cargo, all should be able to so do. To emphasize the significance of this argument, the Court was reminded of the eight defendants who stipulated to discontinue all of the challenged practices until the Federal Maritime Commission could rule on their legality. The plaintiffs countered the defendant's contention of laches that defendant had been utilizing the practice for many years by contending that plaintiffs did not have any knowledge of it; and had they received such knowledge, they would have brought suit at an earlier date.

At the conclusion of the hearing, all parties agreed to the continuance of the temporary restraining order until the decision of this Court is filed on the motion for a preliminary injunction.

■ The first issue facing this Court is whether it has jurisdiction to enter a preliminary injunction in aid of the administrative process of Federal Maritime Commission, until the Commission has decided the substantive issues in the complaint before it. While jurisdiction was originally contested by the defendant, such contest appears to have been abandoned at the hearing on August 10th. Even if it were not, it is clear from decided cases that a district court does have jurisdiction to grant a preliminary injunction for this purpose. Federal Maritime Commission v. Atlantic & Gulf/Panama Canal Zone, 241 F.Supp. 766, 774 (S.D.N.Y.1965) (application denied); Pennsylvania Motor Transport Assn. v. Port of Philadelphia M. T. Assn., 183 F.Supp. 910, 915–917 (E.D. Pa.1960), appeal dismissed, 276 F.2d 931 (3rd Cir. 1960).

■ The remaining and most sensitive issue to be decided is whether upon a balancing of the equities the plaintiffs will suffer such irreparable harm if the injunction is not issued that it should outweigh the possible harm to defendant. This Court is not permitted to adjudicate the ultimate issues in this case. It is for the Federal Maritime Commission as the competent administrative board to determine if the conduct alleged here is in fact illegal. Far East Conference v. United States, 342 U.S. 570, 573–574, 72 S.Ct. 492, 96 L.Ed. 576 (1952). Other courts dealing with the same problem in determining whether to issue a preliminary injunction have first determined if the status quo was being changed by the allegedly illegal conduct and if so, whether in the balance of equities, considering the harm which could occur to either party, the petitioner would be seriously and irreparably harmed if the conduct continued. Federal Maritime Commission v. Atlantic & Gulf/Panama Canal Zone, supra, 241 F.Supp. at 777; Pennsylvania Motor Transport Assn. v. Port of Philadelphia M. T. Assn., supra, 183 F.Supp. at 917.

■ ■ The practice of American President Lines, Ltd., to import cargo bound for the Philadelphia area, through some other port and absorb the inland freight charge should be treated as altering the status quo that should be maintained pending the final administrative determination. While this practice may have continued over a period of years, plaintiffs had no knowledge of these practices until recently. Although defense contends that notice of these practices was evident from certain tariffs it filed, the Federal Maritime Commission points out that such does not legalize such rates or practices nor in any way amount to approval by the Commission. Chicago, M. St. P. & P. R. Co. v. Aloutte Peat Products, 253 F.2d 449, 455–456 (9th Cir. 1957); American Export Isbrandtsen Lines v. Federal Maritime Commission, 409 F.2d 1258, 1260, fn. 4 (2d Cir. 1969). Plaintiffs are, therefore, not barred by any doctrine of laches.

■ Even though the alleged illegal practice continued for a period of years, there is substantial law that a preliminary injunction may nevertheless be entered in aid of administrative proceed-

ings to re-establish and thereafter maintain the status quo as it existed prior to the alleged illegal practices. Angle v. Sacks, 382 F.2d 655 (10th Cir. 1967); Westchester Lodge 2186 v. Railway Express Agency, Inc., 329 F.2d 748 (2d Cir. 1964); Greene v. Mr. Wicke Ltd. Co., 270 F.Supp. 1012 (D.C.Conn.1967). Otherwise, in any case of alleged illegal activities, a preliminary injunction restoring the situation prior to such activities could never be granted, because, by its very nature, such injunctive relief alters the conditions then existing and restores the status quo ante.

The development in recent years of containerized shipping makes the results of any diversionary shipping practices more significant. Containers aboard large container ships greatly facilitate transfer of cargo from port of entry to place of destination overland by motor freight. Thus, the potential harm to the port whose cargo has been diverted is immeasurably increased. Although most, if not all of the cargo destined for the Philadelphia area that defendant, American President Lines, Ltd., has imported through ports other than Philadelphia has been carried in general cargo ships as opposed to containerized cargo ships, a portion of such cargo has been put ashore in containers for convenient transshipment overland by motor freight.

■ The entry and active participation by the Federal Maritime Commission is significant. The Commission lacks authority to issue as part of the administrative process a preliminary "cease and desist order." Trans-Pacific Freight Conference of Japan v. Federal Maritime Board, 302 F.2d 875 (D.C.C.A. 1962).

Injunctive relief has frequently been granted by the Courts as an adjunct to the administrative process. West India Fruit & Steamship Co. v. Seatrain Lines, 170 F.2d 775 (2d Cir. 1948), cert. denied, 336 U.S. 908, 69 S.Ct. 514, 93 L. Ed. 1072. Especially where, as here, the commission intervenes and actively seeks injunctive relief. Id. 170 F.2d at 778.

■ In attempting to balance the equities, it appears clear that the plaintiffs as well as the general public in the Philadelphia Port Area (including Camden and other areas of New Jersey), will suffer extensive irreparable harm if the conduct alleged by plaintiffs, and as shown to exist by the testimony, continues for any extensive period of time. The Federal Maritime Commission proceedings require a "full hearing" and investigation. 46 U.S.C. § 822. The estimated minimum time required for its final decision was stated without controversy to be one year. American President Lines, Ltd., presently diverts only a small quantity of cargo which, in and of itself, would not create any severe harm to the Port of Philadelphia on the basis of past history. Unless prohibited, however, defendant, as well as other shippers who are not bound by the stipulation would be free to engage in the diversionary practices both as to imports and exports to an unlimited extent. Substantial or mass diversion even for a very short period of time would have a disastrous and irreparably harmful effect on the Port of Philadelphia.

The injury resulting to the defendant by granting a preliminary injunction would in comparison be minimal. The defendant claims that only a very small amount of cargo is being shipped by the challenged practice and its direct loss of cargo and thus profits although not insignificant would be small. The defendant contends that although it handles this cargo primarily as a customer service, it will permanently lose customers (mostly to foreign shipping companies), if it is prohibited from accepting cargo for Philadelphia and unloading cargo in other ports and absorbing the inland transportation charges. This seems doubtful since shipping rates would not be altered, nor would defendant be placed in any competitive disadvantage. Some customers might prefer to ship with lines that actually dock ships in Philadelphia, but this is so irrespective of whether defendant diverts the cargo to other ports and pays the inland freight

to Philadelphia. Enjoining defendant will give no other line any economic advantage. On the contrary, if, as contended by plaintiffs and counsel for the Federal Maritime Commission, defendant is engaging in illegal discriminatory practices, the injunction will merely place defendant on an economic par with the other lines. Importation through ports other than Philadelphia will not be prohibited by a preliminary injunction but merely the absorption of the inland freight charges by defendant where such cargo is diverted.

Defense witnesses also testified that a substantial portion of the "diverted cargo" consisted of shipments at government's expense of personal belongings of military and government personnel. It seems unlikely that if defendant is enjoined from continuing to absorb the inland freight to the Philadelphia area by order of this Court, that the government would discontinue this and other shipping with the defendant. More likely, the government would continue to utilize defendant, and pay the inland freight itself, which, of course, would be economically beneficial to defendant, although still not beneficial to the Port of Philadelphia. Almost the precise issue was raised in the recent case of Delaware River Port Authority, et al. v. Sea-Land Service, Inc., C.A. 71–1372 (E.D.Pa. 1971). A stipulation for entry of an agreement similar to the agreements entered into in this case as to eight of the defendants was approved by the parties including the Secretary of Defense.

To the extent that this opinion sets forth additional findings of fact and/or conclusions of law, the same shall be deemed as part of the findings of fact and conclusions of law.

The preliminary injunction will be granted, pending final determination of whether a permanent injunction should be granted until a final determination of the complaint before the Federal Maritime Commission is made. Since plaintiffs are either public corporations or otherwise financially responsible parties, and since the loss, if any, to defendant if this injunction is improperly granted is monetary loss of profits on the small amount of freight testified to by defendant, the amount of the bond will be fixed in the modest sum of $5,-000.00.