STATE OF TEXAS et al.,
Plaintiffs-Appellees,

v.

SEATRAIN INTERNATIONAL, S. A., et al., Defendants-Appellants,

Southern Railway Company et al., Intervenors-Appellants,

South Carolina State Ports Authority, Intervenor-Appellant.

No. 75–1319.

United States Court of Appeals, Fifth Circuit.

Aug. 28, 1975.

Rehearing Denied Oct. 1, 1975.

---

Owen W. Cecil, Houston, Tex., Edward G. Gruis, Douglas N. Jones, Federal Maritime Comm., Neal M. Mayer, Washington, D. C., Eugene A. Spector, Philadelphia, Pa., for Seatrain Intl.

Charles A. Horsky, Michael Boudin, James L. Tapley, Washington, D. C., for So. Railway Co.

Warner F. Brock, Houston, Tex., John L. Hill, Atty. Gen. of Tex., David Hughes, Rex H. White, Jr., Asst. Attys. Gen., Austin, Tex., for plaintiffs-appellees.

William H. Vaughan, Jr., Charleston, S. C., for S. C. State Ports Auth.

Cyrus C. Guidry, New Orleans, La., amicus curiae, for Port of New Orleans.

Peter A. Fitzpatrick, Atty., Interstate Commerce Commission, Washington, D. C., amicus curiae, for appellants.

Before GODBOLD, Circuit Judge, SKELTON, Associate Judge,* and GEE, Circuit Judge.

GEE, Circuit Judge:

The Euro-Gulf minibridge is an intermodal transportation service offered by Seatrain International, S.A. It affords shippers in the Houston, Galveston and Beaumont areas a cargo route to and from Northern Europe alternative to the all-water route from those three ports. Minibridge handles only containerized cargo. Freight shipped via minibridge travels by rail between the Texas ports and Charleston, South Carolina, through New Orleans. Seatrain's container ships move the cargo between Charleston and Northern Europe. A major innovation of the system is that the shipper pays only a single tariff known as a joint rate,[1] and the freight travels under a single bill of lading. This greatly simplifies the paper work formerly involved in a sea/rail shipment. Because Seatrain's ships sail from Charleston more frequently than do those of Lykes Brothers from the Gulf ports and because Charleston is closer in sea miles to Northern Europe than are the Gulf ports, freight shipped via minibridge may arrive at its destination sooner than that sent via the all-water route. Yet the cost to the shipper is approximately the same whether he utilizes the all-water service or minibridge. (Minibridge does appear to have at least one disadvantage—extra cargo handling.) Because the minibridge service involves not only sea but also rail, it comes under the jurisdiction of the Interstate Commerce Commission (ICC) and the Federal Maritime Commission (FMC) as well. As a result, the tariffs are filed with both the ICC and the FMC.[2]

Plaintiffs[3] below, whom we shall refer to as the Texas Ports Interests, successfully sought what they term a preliminary injunction in aid of the administrative processes of the FMC. The court's intervention was necessary, they claim, since the FMC has no independent power to suspend the operation of tariffs filed with it pending decision on their legality and because the joint sea/rail tariffs filed by Seatrain violate Section 16, 17 and 18 of the Shipping Act of 1916, 46 U.S.C. §§ 815, 816, 817 and 8 of the Merchant Marine Act of 1920,[4] 46 U.S.C. § 867. In a nutshell, the complaint of the Texas Ports Interests is that the joint tariff illegally gives undue and unreasonable preference to one locality (Charleston) by diverting to it traffic naturally tributary to another (the Texas ports). This diversion, they allege, causes them irreparable injury. Thus, they say, the operation of the tariffs which foster it should be enjoined during the continuance of the adminis-

---

* Of the U. S. Court of Claims, sitting by designation.

1. A joint rate is one that is published in the tariffs of the carriers maintaining through routes with one another covering the entire through transportation they jointly provide. The carriers participating in the through movement divide the freight charges by agreement among themselves.

2. Considerable coordination of FMC and ICC regulatory requirements was necessary before the joint, combined service tariffs were accepted at both agencies, with the ICC eventually granting special permission for water carriers to file, basically, in the FMC format.

3. The plaintiffs were the State of Texas, the South Atlantic-Gulf Coast District of the International Longshoremen's Association, AFL–CIO, and Lykes Brothers Steamship Co., Inc.

4. As we have observed, Section 8 of the Merchant Marine Act of 1920 is actually more a statement of Congressional policy than a specific statutory prohibition of any kind. *Port of New York Authority v. Federal Maritime Commission,* 429 F.2d 663, 670 (5th Cir. 1970), *cert. denied,* 401 U.S. 909, 91 S.Ct. 867, 27 L.Ed.2d 806 (1971).

trative process, currently ongoing, which will determine their legality. The pro-minibridge forces, Seatrain, as defendant, the Southern Railway Company, the Alabama Great Southern Railroad Company, the Southern Pacific Transportation Company, and the South Carolina State Ports Authority, as intervenors, opposed the injunction, as did the FMC and the ICC, who have participated throughout the proceedings as *amici curiae*. Since we are convinced that the trial court abused its discretion in issuing the preliminary injunction, we reverse.

At the outset, we confront a jurisdictional problem. The Federal Maritime Commission has no power to enjoin, prior to a final determination of their validity, rates or conduct which might violate the Shipping Act of 1916, *Trans-Pacific Freight Conference of Japan v. Federal Maritime Board,* 112 U.S. App.D.C. 290, 302 F.2d 875, 878–80 (1962), 46 U.S.C. § 821. However, the federal courts have long held that they may, in the exercise of their general equitable powers, entertain actions filed either by the Commission or by private parties for preliminary injunctions to maintain the status quo and prevent irreparable injury pending the outcome of the oft-times protracted administrative process of the FMC. *Delaware River Port Authority v. Transamerican Trailer Transport, Inc.,* 501 F.2d 917 (3d Cir. 1974) (cited hereafter as TTT); *West India Fruit & Steamship Co. v. Seatrain Lines,* 170 F.2d 775 (2d Cir. 1948), *dism'd,* 336 U.S. 908, 69 S.Ct. 514, 93 L.Ed. 1072 (1949); *F. M. C. v. Australia/U. S. Atlantic & Gulf Conf.,* 337 F.Supp. 1032 (S.D.N.Y.1972); *Delaware River Port Authority v. United States Lines, Inc.,* 331 F.Supp. 441 (E.D.Pa.1971); *Federal Maritime Commission v. Atlantic & Gulf/Panama Canal Zone,* 241 F.Supp. 766 (S.D.N.Y.1965); *Penn. Motor Truck Ass'n v. Port of Philadelphia Marine Terminal Ass'n,* 183 F.Supp. 910 (E.D.Pa. 1960); *Isbrandtsen Co. v. United States,* 81 F.Supp. 544 (S.D.N.Y.1948) *appeal dismissed sub nom. A/S J. Ludwig Mowinckels Rederi v. Isbrandtsen Co.,* 336

U.S. 941, 69 S.Ct. 813, 93 L.Ed. 1099 (1949). The Interstate Commerce Commission, on the other hand, is vested with power to suspend, at its discretion, for a period of seven months, rates filed with it pending hearing and decision on their lawfulness. 49 U.S.C. § 15(7). The existence of this power in the ICC, it has been held, evinces the deliberate decision of Congress to extinguish judicial power to grant any injunction which interferes with the Commission's discretionary decision to suspend rates filed with it at anytime before the Commission finally determines the lawfulness of the rates. *United States v. Scrap,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Arrow. Transportation Co. v. Southern R. Co.,* 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963). The pro-minibridge forces, supported by the ICC as amicus curiae, while conceding the district court's jurisdiction to consider issuing a preliminary injunction against the implementation or continuation of a rate filed with the FMC in a "normal" case, urge that jurisdiction is absent here because these joint rates were filed with the ICC. We refuse to embrace so mechanical an approach.

The district court was asked to issue a preliminary injunction against activity of defendant Seatrain which, as a common carrier by water, is subject to the jurisdiction of the FMC. The ICC, according to its own stated policy, neither has nor makes claim to have jurisdiction over the ocean portion of the rates charged by water carriers, International Joint Rates and Through Routes, 337 I.C.C. 625 (1970) and 341 I.C.C. 246 (1972); nor is it concerned with the activity or conduct of those carriers. Further, the ICC was not constituted to regulate ocean shipping practices (or rates) and has neither power nor responsibility to enforce the provisions of the Shipping Act of 1916 (or any other act relating to shipping). The injunction sought was aimed solely at conduct by Seatrain which allegedly violates certain sections of the Shipping Act of 1916 and the policy of Section 8 of the Merchant Marine Act of 1920. In a joint rate case any preliminary injunction is-

sued against a water carrier does, of course, encroach to some degree upon the ICC's domain of discretionary authority to suspend the rail portion of that rate. We have concluded, however, that this incidental effect does not prevent a court's exercising inherent equity powers to prevent irreparable injury, where persons allegedly protected by the shipping acts show injury caused by alleged violations of those acts by persons clearly subject to their prohibitions and who are in no wise subject to ICC control or regulation. Such a result would be nonsense in light of the fact that a permanent order of the FMC banning the ocean carrier's collection of the joint rate would have the identical incidental effect on the ICC's discretion; yet it is obvious that the FMC may forbid activity which violates the Shipping Act and clear that Congress never intended 49 U.S.C. § 15(7) to divest the FMC of this power. Here the district court was asked to act temporarily as an adjunct of the FMC, in an area clearly subject to FMC jurisdiction and control. The complaint filed with it was of Shipping Act violations which do not concern the ICC. We hold that there is nothing in 49 U.S.C. § 15(7) nor in the rationale of *Arrow* or *Scrap* which stripped the court of jurisdiction to consider the case. Section 15(7) gives the ICC exclusive control within its own domain, not over any into which it may be thrust.

◼ We may review the district court's grant of its preliminary injunction for abuse of discretion only. *Johnson v. Radford*, 449 F.2d 115 (5th Cir. 1971). In our review, however, we must remember that granting a preliminary injunction is the exception rather than the rule. As we said in *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567 (5th Cir. 1974), it is an extraordinary and drastic remedy which should not be granted unless the movant has clearly carried the burden of persuasion concerning the existence and application of what we have recognized as the four prerequisites to such relief. These are: (1) a substantial likelihood that the movant will eventually prevail on the merits;

(2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the party or parties opposed; and (4) a showing that the injunction, if issued, would not be adverse to the public interest. *Canal Authority, supra,* 489 F.2d at 572; *Di Giorgio v. Causey*, 488 F.2d 527 (5th Cir. 1973); *Blackshear Residents Organization v. Romney,* 572 F.2d 1197 (5th Cir. 1973); *Allison v. Froehlke,* 470 F.2d 1123 (5th Cir. 1972).

◼ We need not long consider two of the four factors. The trial court found and the parties do not seriously dispute that a significant amount of freight which would otherwise pass through the Texas ports is diverted to Charleston by minibridge. The loss of this traffic has caused the Texas ports, including their citizens and the longshoremen, as well as Lykes Brothers, considerable economic loss. The loss will continue as long as this cargo flows from the Texas ports by rail rather than by ship. Although economic loss is not normally considered irreparable if an adequate remedy at law exists, *see* 11 Wright & Miller, Federal Practice and Procedure: Civil, § 2948, fn. 25 (1973), any action for reparation which the port interests might seemingly have pursuant to 46 U.S.C. § 821 is probably illusory. The monetary damages, although obvious and doubtless very large, are not susceptible of specific proof, and impossibility of proof has long been recognized as bearing upon adequacy of the legal remedy. The trial court correctly found that the Texas Ports Interests showed irreparable injury, absent the issuance of a preliminary injunction.

This is a case shot through with public interests, but it is not one in which an overriding public interest can be identified independent of the interests which the various parties represent. It is evident that some segments of the public (persons and institutions associated with or dependent upon Charleston, Seatrain or the railroads) are disserved by the preliminary injunction; it is equally ap-

parent that others (those allied with the Texas Ports Interests) would be disserved by its vacation. There is advantage, of course, to the shipping public in having a competitively-priced, alternative route to and from Northern Europe, but considering the numerous interests involved here, we cannot say that disservice to the shippers' interests should be determinative.[5] On balance, the public interest factor seems essentially neutral.

 No matter how severe and irreparable an injury one seeking a preliminary injunction may suffer in its absence, the injunction should never issue if there is no chance that the movant will eventually prevail on the merits. Nor is there need to weigh the relative hardships which a preliminary injunction or the lack of one might cause the parties unless the movant can show *some* likelihood of ultimate success. Obviously, it is inequitable to temporarily enjoin a party from undertaking activity which he has a clear right to pursue. However, one appealing to the conscience of the chancellor to maintain the status quo pending final decision, although he carries a burden, is not required to prove to a moral certainty that his is the only correct position. The prerequisite, as an absolute, is more negative than positive: one cannot obtain a preliminary injunction if he clearly will not prevail on the merits; however, that he is unable, in an abbreviated proceeding, to prove with certainty eventual success does not foreclose the possibility that temporary restraint may be appropriate. In its negative sense, the factor is critical; but viewed positively, the importance and nature of the requirement can vary significantly, depending upon the magnitude of the injury which would be suffered by the movant in the absence of interlocutory relief and the relative balance of the threatened hardship faced by each of the parties. *Canal Authority, supra.* This is so because, as we have noted, none of the four prerequisites has

a fixed quantitative value. Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus. *Siff v. State Democratic Executive Committee,* 500 F.2d 1307 (5th Cir. 1974).

It is particularly difficult for a court to forecast the probable winner in an administrative proceeding. As all parties recognize, primary jurisdiction here is in the FMC, and in determining the merits it is for the Commission and not the courts, in the first instance, to develop the facts fully and apply the law to them. It is now basic to our jurisprudence that when primary jurisdiction is in an administrative agency the courts will generally refrain from intermeddling. Certainly a court should take no action calculated to interfere seriously with an agency's ability to apply its expertise to solve those technical and complex regulatory problems which have been entrusted to it. Pressing these principles, the defendants, supported by the FMC—which opposes the preliminary injunction—seem to assert that the district court should have made no investigation into the substance of plaintiffs' claim. To do so, they seem to argue, is to interfere with the FMC's primary jurisdiction. The result of this line of reasoning would, of course, be to preclude a court from independently assessing one of the four prerequisites—the likelihood of success on the merits. The defendants and the FMC would, apparently, bind the courts by the agency's assessment of plaintiffs' case. A court may not be so bound.

The district court was asked to perform a judicial function which was within its jurisdiction and power. To carry out the function it was required to perform certain tasks and to perform them independently—as a court. One of these was to pass judgment upon the likelihood of the Ports Interests' eventual success on their substantive claims before the FMC. This was a duty which it was required to perform, and although it was

5. In the event of an injunction, sea/rail service between the Texas ports and Northern Europe via Charleston would still be available, albeit at a higher price and with added red tape.

free to regard the FMC's evaluation and should—as we are sure that it did—have given the expert agency's opinion great weight, see *TTT supra,* 501 F.2d at 923, fn. 14, it could not shirk that duty by blind deference to the Commission's assessment. Further, we disagree with the Commission that a court-evaluation of the probability of success on the merits in any way interferes with the FMC's administrative process.

The FMC is not bound by any fact found by a court in a suit for a preliminary injunction. Nor need it interpret its legal precedents in the manner that a court predicts it might. In short, it is as free to decide the merits of a case pending before it in the presence of a preliminary injunction as it would be in the absence of one.

The district court concluded that the Texas Ports Interests "adduced evidence of what may be violations of Sections 16, 17 and 18 of the Shipping Act of 1916, 46 U.S.C. Section 801, et seq., and Section 8 of the Merchant Marine Act of 1920, 46 U.S.C. Section 861 et seq." We agree. Without going into extended detail (so as to avoid even the appearance of interference with the FMC's determination of the matter), we observe that the Texas Ports Interests did present evidence of facts which would indicate possible violations of the Shipping Act and of the Congressonal policy expressed in Section 8 of the Merchant Marine Act in light of such FMC precedents as Intermodal Service to Portland, Oregon, FMC Docket No. 70–19, decided Oct. 29, 1973, 17 FMC ——, 14 P & F Shipping Regulation Rptr. 107; *Stockton Port District v. Pacific Westbound Conference,* 9 FMC 12 (1965), aff'd 369 F.2d 380 (9th Cir. 1966); *Beaumont Port Commission v. Seatrain Lines, Inc.,* 2 USMC 500 (1941) and 2 USMC 699 (1943); and *City of Mobile v. Baltimore Insular Line, Inc.,* 2 USMC 474 (1941). We recognize, of course, that these precedents can be distinguished and that the older ones may have been

eroded somewhat by Investigations of Overland/OCP Rates and Absorptions, 12 FMC 184 (1969), aff'd sub. nom., *Port of New York Authority v. FMC,* 429 F.2d 663 (5th Cir. 1970), cert. denied, 401 U.S. 909, 91 S.Ct. 867, 27 L.Ed.2d 806 (1971). We recognize too that it is for the FMC, and not the courts, to determine ultimately whether its concepts of absorption, port equalization, naturally tributary territory and transshipment apply to the facts of this case, which involves ports in different ranges, and, if so, how. However, we certainly cannot say that the Texas Ports Interests will definitely not prevail and we can say that they have shown that they might.[6] The showing was not crushing, as it probably never could be in a case such as this involving difficult questions of law and fact, but it was sufficient to prevent the automatic preclusion of a preliminary injunction.

There remains only the question of whether the injury currently being suffered by the Texas Ports Interests significantly outweighs that which the minibridge interests would suffer if a preliminary injunction were to issue. The trial court held that it does, but we can find no justification for that conclusion. Absent an injunction, minibridge will continue to divert cargo from the Texas ports to Charleston. This diversion causes significant economic injury to the ports and to their citizens, to Texas longshoremen and to Lykes Brothers. However, it appears to us that a preliminary injunction would cause virtually identical injury in substantially the same degree to Charleston, to Charleston longshoremen and to Seatrain. *See TTT, supra,* at 924. The Texas Ports Interests argue that the balance is, nevertheless, in their favor because minibridge may permanently change preexisting shipping patterns; and it is indeed deeply troubling to view the prospect of their being told to hang quietly by their thumbs while cargo formerly handled by them is diverted and the administrative process

6. The FMC, in its brief, has taken the position that "a favorable result [to the Ports Interests] is possible, but not reasonably certain. . . ."

pursues its glacial course.[7] But even aside from the problem that the Texas Ports Interests stood by for ten months before seeking a preliminary injunction, thus allowing a faint shade of laches to fall on their cause, the change of pattern is about counterbalanced by the significant negative economic impact that continuing the preliminary injunction would have on the railroads which are parties to the suit.

■ Given the Texas Ports Interests' less-than-overpowering prospects of ultimate success, the near symmetrical balance of harms which enjoining or not enjoining causes, and the deference due the FMC's position and processes in the matter, we conclude that the district court abused its discretion in issuing the injunction.

Reversed with instructions to dissolve the preliminary injunction and dismiss the suit.

---

7. It may be that, should injunctive relief again be sought by Texas Ports Interests, protracted inaction by FMC would both constitute a significant change of circumstance and properly figure in the calculus.